T.C. Memo. 1995-494


UNITED STATES TAX COURT


FORETRAVEL, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL AL REVENUE, Respondent


Docket No. 27875-92.                    Filed October 12, 1995.


<u>George W. Connelly, Jr.</u>, and <u>Linda S. Paine</u>, for petitioner.

<u>Lillian D. Brigman</u> and <u>Susan V. Sample</u>, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION

CLAPP, <u>Judge</u>:  Respondent determined deficiencies in, and additions to, petitioner's Federal corporate income taxes as follows:

| FYE | | Additions to Tax | |
| June 30 | Deficiency | Sec. 6661 | Sec. 6662 |
| 1989 | $1,358,614 | $339,654 | -- |
| 1990 | 922,494 | -- | $184,499 |

After concessions by the parties, the issues for decision are:

(1)  Whether petitioner is entitled to a deduction for its fiscal year ended June 30, 1989, in the amount of $1,933,994.10 advanced to solve the financial problems of a dealership.  We hold that petitioner is so entitled.

(2)  Whether petitioner is entitled to exclude from gross income, or deduct under section 162, in its fiscal years ended June 30, 1989, and June 30, 1990, the respective amounts of $1,160,673.58 and $2,510,135.98 as incentives to its dealerships. We hold that petitioner is entitled to exclude the respective amounts from gross income.

(3)  Whether petitioner is liable for an addition to tax pursuant to section 6661 for its fiscal year ended June 30, 1989. We hold that petitioner is not.

(4)  Whether petitioner is liable for an addition to tax pursuant to section 6662 for its fiscal year ended June 30, 1990. We hold that petitioner is not.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

## FINDINGS OF FACT

Some of the facts are stipulated and are so found.  We

incorporate by reference the stipulation of facts and attached exhibits.

Background

Petitioner is Foretravel, Inc. (Foretravel), a corporation organized in 1968 under the laws of the State of Texas, with its principal place of business in Nacogdoches, Texas. During the years in issue, petitioner filed its tax returns on a June 30 fiscal year basis. Petitioner manufactured and sold class A self-contained motor homes (coaches) ranging from 29 to 40 feet in length. Petitioner sold its coaches under the trade names of Grand Villa and Unihome. The Grand Villa sold for retail prices from $103,000 to $245,000, while the Unihome sold for retail prices from $172,000 to $310,000.

Foretravel personnel included the following: Clarence M. Fore (Mr. Fore), president; Don Franklin (Franklin), vice president and chief financial officer; James Don Moore (Moore), vice president and general manager; Ruth Marie Fore (Mrs. Fore), secretary and treasurer; Bill Weaver (Weaver), comptroller and assistant treasurer; and Floyd Wilcox (Wilcox), director of marketing operations. Mr. Fore spent his time designing and selling coaches, while Moore essentially ran petitioner's operations until his death in 1993.

Mr. Fore built his first motor home in his spare time in 1967 and incorporated Foretravel one year later to manufacture

motor homes. Foretravel remained a family business until 1971, when Mr. Fore, along with his friend Moore, quit their jobs and went to work full time for Foretravel. Franklin also joined Foretravel about that time, and Foretravel began advertising in travel magazines while the Fores attended recreational vehicle shows to display Foretravel coaches. As petitioner's coaches began to gain popularity, its salespeople sold coaches to existing vehicle dealerships and directly to customers. By 1977, 35 to 45 dealers were selling Foretravel coaches, and Foretravel was making approximately 500 coaches a year. From its inception, petitioner sought to build a high quality coach with top quality components. Petitioner carved out its market niche of expensive, high quality coaches for the affluent traveler who enjoyed extended vacations. Petitioner sponsored regional clubs that offered courses in motor home maintenance and organized domestic and international caravans for motor home owners. During the years in issue, the Foretravel Motorcade Club had over 2,000 active members.

Petitioner suffered setbacks in the late 1970s due to the 1978 "energy crunch" and high interest rates. These factors also affected independent dealers' interest in stocking Foretravel coaches and, as a result, only two independent dealers continued to sell Foretravel coaches. Petitioner's sales fell below the anticipated level of production, and petitioner had to lay off

employees. Petitioner decided to become more involved at the dealer level and, in 1979, petitioner took over a dealership in California (the California dealership) that owed petitioner money.

The Fores traveled to California to run the California dealership, and they managed to boost sales from 3 coaches a month to over 20 a month. The Fores continued to operate the California dealership until the middle of 1980 when they returned to Nacogdoches, Texas. Due to the success of the California dealership, petitioner purchased other dealerships in Texas, Tennessee, and Florida. In each case, these other dealerships were existing businesses that sold other vacation vehicles, such as trailers and inexpensive motor homes, in addition to selling Foretravel coaches. The California dealership was the only dealership suffering financial problems when purchased by petitioner.

By 1989, petitioner owned 100 percent of the stock of Foretravel of Arizona, Inc. (the Arizona dealership), but the Arizona dealership closed in 1989 following a change in Arizona State law. Petitioner also owned 100 percent of the stock of Investments in General, Inc. (IIG). IIG had four wholly owned subsidiaries: Foretravel of California, Inc. (the California dealership); Foretravel of Florida, Inc. (the Florida dealership); Murphy Motor Manors, Inc. (the Tennessee

dealership); and Foretravel of Texas, Inc. (the Texas dealership), which apparently included two separate dealerships, one located in Dallas and the other located in Nacogdoches. We refer to the dealers collectively as subsidiaries or dealerships. Moore served as president of the subsidiaries and the Arizona dealership. IIG owned the dealerships' stock because petitioner wished to avoid the appearance that it sold its coaches through factory-owned dealers. IIG and the subsidiaries filed consolidated returns in 1989 based on a December 31 calendar year. In 1990, IIG was liquidated, and petitioner acquired the dealerships' stock. The subsidiaries filed separate returns in 1990 based on a calendar year ending December 31.

The Pacific Northwest Dealership

In 1980, Walter P. Nicholson (Nicholson) and William H. Fishfader (Fishfader) became partners in a Toyota agency in Coeur d'Alene, Idaho, where they sold motor homes, recreational vehicles, and automobiles. In 1983, they decided to sell recreational vehicles full time and became interested in the Foretravel product line. They contacted a Foretravel representative on the West coast and eventually signed a dealer agreement with Foretravel on August 15, 1983, that enabled them to be the exclusive dealer of Foretravel products for a 5-year period in Idaho, Montana, Oregon, and Washington. Pursuant to the agreement, Fishfader and Nicholson also could sell less

expensive product lines but not product lines that would compete directly with Foretravel. The resulting dealership was named Pacific Northwest Motorhomes (Northwest). Northwest stocked at least one line of motor homes other than Foretravel.

The agreement between petitioner and Northwest provided that they were "independent contractors as to each other and not otherwise". The agreement required petitioner to deliver three units per quarter, and required Northwest to maintain an inventory of parts and accessories and an inventory of coach models in a clean and orderly condition. The agreement also required Northwest to maintain a regular place of business and display units for sale while promoting and advertising Foretravel within Northwest's established territory. The parties modified the original agreement to require Northwest to purchase 12 units in the first year, 18 units the second year, and 24 units for the remaining 3 years. Petitioner did not perfect a security interest under Idaho law in the units shipped to Northwest on credit.

Between 1983 and 1985, Northwest grew rapidly, added a second location, and soon became one of the largest dealers in that geographic region for high quality coaches. In 1985, Fishfader became interested in another dealership in Spokane, Washington, so he and Nicholson made arrangements to purchase the Spokane dealership.

Fishfader had become disillusioned with the expense and time that it took to sell the higher quality coaches such as those manufactured by Foretravel. Fishfader wanted to drop the entire Foretravel line of coaches and focus on selling a higher volume of the less expensive coaches. Nicholson felt that focusing entirely on less expensive coaches would be a mistake, and he wanted to continue selling the Foretravel line. Fishfader and Nicholson were unable to agree on whether to drop the Foretravel line of coaches and, in 1985, Fishfader asked Nicholson to purchase his interest in Northwest. Nicholson did not have the funds to purchase Fishfader's interest, so he approached petitioner and asked for financial assistance.

Petitioner had established similar relationships in the past and had recently acquired the Arizona dealership, but petitioner was not looking for additional company-owned dealerships. Nonetheless, Nicholson persuaded petitioner that Northwest was doing an excellent job, and that it would not be in petitioner's best interest for Northwest to drop the Foretravel product line. Petitioner concluded that, if it did not assist Nicholson, there would no longer be a Foretravel dealer in that region.

On August 30, 1985, petitioner agreed to purchase Fishfader's 51-percent interest in Northwest for $27,017. Several weeks later, petitioner and Nicholson entered into a repurchase agreement (the repurchase agreement) which provided

that Northwest would issue 1,000 shares of class B common stock to be purchased by petitioner for $1,000. At the end of 3 years, Nicholson was granted an option to repurchase petitioner's 51-percent stock holdings of class A common stock at book value if petitioner's loans to Northwest had been repaid and corporate debts guaranteed by petitioner had been paid. Nicholson viewed petitioner's ownership of the Northwest stock as a temporary arrangement because he intended to purchase the stock back from petitioner in a very short time. Petitioner granted Nicholson a further option to buy the shares of class B stock from petitioner at the end of 10 years for $1,000 plus interest, but only if Northwest had repurchased petitioner's class A stock. Petitioner also lent Northwest $22,983 to be repaid over 10 years. In a separate agreement dated September 9, 1985, petitioner and its officers guaranteed the floorplan of Northwest up to $1.2 million financed by Idaho First National Bank (Idaho First). Prior to this time, Fishfader had guaranteed Northwest's floorplan. Idaho First also required petitioner to pledge as additional collateral a certificate of deposit in the amount of $150,000.

A floorplan arrangement works as follows. The dealership wanting coaches for inventory makes the necessary arrangements with a lender. When the dealership orders a coach, the manufacturer contacts the lender for approval to ship the coach to the dealership. Title documents are sent through the banking

system to the lender, who then pays the manufacturer. The lender retains title to the coach. The dealership owes interest on the amount financed by the lender until the coach is sold. When the dealership sells the coach, the dealership pays the lender the amount financed, and the difference between the dealership's cost and the sale price is the dealership's profit.

In March 1988, Northwest arranged to have Chrysler First Wholesale Credit, Inc. (Chrysler First), finance its floorplan. Chrysler First no longer required petitioner's officers personally to guarantee the financing arrangement, and it did not require petitioner to pledge the $150,000 certificate of deposit as additional collateral. Petitioner remained the sole guarantor of Northwest's floorplan financing. The Chrysler First guarantee agreement provided that the obligation of the guarantor, petitioner, was primary and was a guarantee of payment, not of collection. Therefore, Chrysler First could proceed against the guarantor jointly or severally without having commenced any action against or having obtained any judgment against the obligor, Northwest.

In the spring of 1988, Northwest's sales began to slow down. Other high-quality coach manufacturers began to offer deep discounts on their new coaches, selling at cost or below cost in an attempt to move inventory. This competition affected Northwest's sales of new coaches. Northwest also had a large

inventory of used coaches that had been taken in as trades. Used coach sales also declined, and Northwest suffered cash-flow problems from the cost to inventory the used coaches.

As the problems mounted, Northwest used the proceeds from the sales of coaches to pay the most pressing operating expenses or floorplan costs rather than floorplan loans, thus rendering itself "out of trust". Nicholson admittedly "robbed Peter to pay Paul". In April 1988, checks from Northwest payable to petitioner were rejected by the bank due to insufficient funds; however, Northwest did eventually pay the checks that were rejected. Franklin began contacting Nicholson on a regular basis about Northwest's accounts payable to petitioner. Nicholson pacified Franklin by telling him whatever was needed "to keep things going" so that Northwest could find a way to pull out of the slump. Northwest had a deficit equity of $105,434 on April 30, 1987, which increased to $469,176 on June 30, 1988. Prior to October 1988, Northwest's officers included Nicholson as president, Moore as vice president, Weaver as treasurer, and Mrs. Fore as secretary; while Nicholson, Mr. Fore, Moore, and Franklin served on the board of directors. From the time petitioner purchased Fishfader's stock in Northwest through the fall of 1988, Nicholson managed Northwest, and petitioner exerted no control over Northwest and did not dictate Northwest's policy.

By late September or early October 1988, Nicholson had

stopped sending financial statements to Chrysler First consistently. Chrysler First requested and received Northwest's financial statement and realized that Northwest's liabilities far exceeded its assets. Chrysler First notified Nicholson and threatened to close Northwest and take over the remaining assets. Neither Nicholson nor Northwest had the funds to pay Chrysler First and, in October 1988, Nicholson contacted Franklin and told him that Northwest was in trouble because he was "out of trust". Nicholson used proceeds from sales of consigned coaches, as well as coaches sent by petitioner, to pay operating expenses instead of paying the consignee or petitioner. Chrysler First called Franklin and told him that petitioner, as guarantor, would have to make good on the lines of credit.

Franklin and Wilcox traveled to Coeur d'Alene, Idaho, to assess the situation at Northwest. Northwest had no record of its coach inventory, its parts inventory was overstated and disorganized, and the administrative offices were in disarray. After 3 or 4 days in Idaho, Wilcox and Franklin returned to Nacogdoches, Texas.

Chrysler First demanded $345,000 immediately, and on October 10, 1988, petitioner agreed to lend Northwest $345,000, which Northwest applied to the Chrysler First loan guaranteed by petitioner. Moore, in his capacity as vice president of Northwest, gave petitioner a 1-year, interest-bearing promissory

note dated October 11, 1988, in the amount of $345,000. The promissory notes that Northwest gave to petitioner required that interest at the rate of 10 percent per annum be paid in full annually. According to the information available as of October 18, 1988, Northwest owed petitioner $1,019,176.50, and Moore, acting as vice president of Northwest, gave petitioner a 1-year, interest-bearing promissory note dated October 18, 1988, in that amount.

Wilcox returned to Coeur d'Alene, Idaho, in November 1988 to install petitioner's accounting system at Northwest, which took approximately 6 weeks. During that time, Wilcox discovered that Northwest owed more money to Chrysler First. After Wilcox and Nicholson met with Chrysler First personnel in Seattle, Washington, Wilcox requested an additional $385,000 from petitioner to pay Chrysler First pursuant to petitioner's guarantee. On November 3, 1988, petitioner agreed to lend Northwest an additional $385,000, and Moore, acting as vice president of Northwest, gave petitioner a 1-year, interest-bearing promissory note dated November 4, 1988, for that amount.

While establishing an accounting system for Northwest, Wilcox closed old accounts, opened new ones, and placed various financial controls on Northwest's future operations. Wilcox closed four of Northwest's five existing bank accounts, and the fifth was used as a depository account to which Nicholson did not

have access. Wilcox opened a working fund account with a separate bank, and if Nicholson needed money from the working fund, he would need petitioner's approval for the expenditure.

Wilcox asked Nicholson for additional assets to secure petitioner's receivables, but Nicholson had none to pledge, other than his stock in Northwest and his rights in two patents. By this time Nicholson's house and car were highly leveraged, and he had a minimal balance in his checking account. Nicholson delivered his Northwest stock to petitioner as collateral for petitioner's receivables. In an auditor's report dated August 21, 1989, petitioner's accountant recorded this transaction as a purchase of the remaining 49 percent of issued and outstanding Northwest voting stock from Nicholson on November 1, 1988, but the accounting record does not disclose any purchase price. Nicholson also transferred his patent rights to petitioner, but those rights proved to be of no value.

Petitioner continued to ship coaches to Northwest, and all of the units were shipped on credit, with the cost of the unit carried on petitioner's books as a units account receivable. The value of approximately seven units that petitioner shipped to Northwest before October 28, 1988, was included as part of petitioner's bad debt deduction for 1989. Most of the units that petitioner shipped to Northwest from October 28, 1988, through June 30, 1989, were written off as bad debts by petitioner on

June 30, 1989 as follows:

| Date shipped | Cost written off by Foretravel |
|---|---|
| 10/28/88 | $110,950 |
| 11/04/88 | 111,967 |
| 11/29/88 | 77,537 |
| 12/21/88 | 115,088 |
| 1/24/89 | 134,140 |
| 1/31/89 | 114,650 |
| 2/23/89 | 112,385 |
| 3/23/89 | 115,318 |
| 6/10/89 | 99,075 |
| 6/12/89 | 80,494 |
| Total: | $1,071,604 |

Petitioner also shipped to Northwest unit #3332 (cost $196,185) on November 9, 1988, and unit #3335 (cost $110,270) on November 18, 1988, and Northwest reduced the balance due on unit #3332 by $31,255 and paid for unit #3335 in full. Northwest made these payments in November 1988.

In January 1989, petitioner sent Pam Clark (Clark) to Northwest as a general manager to manage the business side of Northwest while Nicholson focused on sales. Northwest's situation did not improve, and later that same month, Jim Ratliff (Ratliff), a private investor, demanded payment from Northwest on a $50,000 note which was not recorded on Northwest's books. Nicholson had obtained floorplan financing from Ratliff on less expensive coaches that were too old for Chrysler First to floorplan. Nicholson had given Ratliff a note for $50,000 secured by rights in one of Nicholson's patents. Nicholson never

informed petitioner about Ratliff's note.  In January 1989, Nicholson surrendered ownership of his stock in Northwest to petitioner.

On January 8, 1989, Nicholson and petitioner amended the repurchase agreement.  The amendment provided that petitioner owned 100 percent of Northwest's stock, and that Nicholson would regain the 49-percent interest in Northwest when Northwest repaid petitioner's accounts receivables due from Northwest and repaid the advances made to Northwest during 1988.  On January 9, 1989, petitioner agreed to advance Northwest $50,000, and Moore, acting as vice president of Northwest, delivered a 1-year, interest-bearing promissory note to petitioner in that amount.  Northwest repaid petitioner $50,000 on February 22, 1989, but no interest was paid for the time the note was outstanding.

In April 1989, Tracy Golden (Golden), a partner from the accounting firm of Axley & Rode, who had been working on the Foretravel account since 1983, was performing routine interim audit work on petitioner's financial statements when he became concerned that the receivables from Northwest might affect his ability to express a "clean" opinion on petitioner's financial statements.  Golden wanted to observe firsthand the situation at Northwest.  He discussed the matter with Weaver, and they decided to inspect Northwest and assess the situation.

On May 23, 1989, petitioner settled a note given to Fishfader by Northwest.  Petitioner paid Chrysler First

$132,390.10 for two Rockwood coaches floorplanned by Chrysler First. These coaches were then transferred to Fishfader in exchange for the note given to him by Northwest. Moore, acting as president of Northwest, delivered to petitioner a 1-year, interest-bearing promissory note dated May 24, 1989, in the amount of $132,390.10.

About this same time, late May 1989, Ratliff produced another note signed by Nicholson, as president of Northwest, in the amount of $225,000. Petitioner sent a representative to Coeur d'Alene, who met with Nicholson and asked him to resign and not return in any capacity. Petitioner immediately consulted its lawyer about what options were available regarding Northwest and Nicholson. Petitioner's officers still felt that Northwest was in a marketable area and had potential for success, despite its poor financial condition.

In June 1989, Golden and Weaver made a surprise visit to Northwest. They found the parts inventory and parts room in disarray, and some used coaches were missing while others were in disrepair. They also went to Northwest's accountant's office to inquire about some of the information on Northwest's financial statements. The accountant stated that he compiled the financial statements from the numbers he received from Nicholson and, previously, Fishfader. The accountant never inspected bank statements, check registers, or receipts.

Golden and Weaver took an inventory of motor homes, vans, and cars, and also inspected some of Northwest's records. Looking for sources of collection for the amounts that Northwest owed petitioner, Golden reviewed the assets at the dealership, and he concluded that Northwest was insolvent to the extent of roughly $2 million. Golden's conclusion was contrary to compilation statements given to petitioner by Northwest the year before. Golden and Weaver boxed up as many of Northwest's records as they could and shipped them back to Nacogdoches, Texas, for review. After reviewing Northwest's records in Nacogdoches, Golden concluded that cash was missing from Northwest, but he was unable to determine where the cash might be. Petitioner did investigate the possibility that Nicholson had pocketed the cash, but by this time Nicholson had few if any assets available for collection.

Axley & Rode analyzed Northwest's assets and liabilities to determine whether Northwest's receivables were collectible. After a review of Northwest's records, Golden advised petitioner that Northwest could not generate the cash-flow needed to pay the amount owed to petitioner. Northwest's receivables were pledged to the finance company, new inventory of coaches not manufactured by petitioner ("X" brand coaches) was floorplanned by Chrysler First, and the value of the used coaches was inflated. The total assets on the books were $1,096,491 and liabilities were $3.5

million, of which $2.4 to $2.5 million was owed to petitioner. Northwest had lost $1,663,189 in its year ended December 31, 1988, and through June 1989 had lost approximately $600,000. After Golden had the Axley & Rode tax department research the question, he advised petitioner to deduct the Northwest receivables as a bad debt.

By the end of June 1989, petitioner believed that Northwest could not pay, and did not have the potential to pay, the existing receivable balances. Mr. Fore was concerned that Northwest's situation could cause bad publicity among potential customers and have a negative impact on petitioner.

On June 30, 1989, petitioner wrote off as a bad debt the following items attributable to Northwest: Trade accounts receivable in the amount of $54,438.13, which included advertising, insurance, and other expenses that petitioner paid on Northwest's behalf; notes receivable in the amount of $885,373.10; and unit accounts receivable in the amount of $1,758,847.50. The notes receivable in the amount of $885,373.10 consisted of the note dated October 11, 1988, in the amount of $345,000, the note dated November 4, 1988, in the amount of $385,000, and the note dated May 24, 1989, in the amount of $132,390.10. The remaining $22,983 in the notes receivable account consisted of the loan to Northwest in 1985 when petitioner acquired 51 percent of Northwest's stock.

Northwest recorded as income on its books the amount of petitioner's bad debt writeoff.  After June 30, 1989, petitioner did not receive any other assets, cash, or property owned or on the books of Northwest as of June 30, 1989.  Funds that petitioner received from Northwest after June 30, 1989, were attributable to units delivered to Northwest after June 30, 1989.

Foretravel Incentive Program for Dealerships

Petitioner established uniform bookkeeping systems for the subsidiaries, and the subsidiaries also used standard paperwork, including forms distributed by the Recreational Vehicle Dealer International Association.  The dealerships were retail merchants that sold and serviced new motor homes, including those manufactured by Foretravel, less expensive motor homes, used motor homes, trailers, and other service recreational vehicles.  Each dealership carried at least one "X" brand line of motor homes.

Motor home manufacturers use a variety of incentive plans designed to promote the sale of their products.  Petitioner was no exception.  Through its incentive program, petitioner sought to maintain a steady flow of coaches through its manufacturing operation, thus avoiding fluctuations in employment, supplies, and general level of operation.  Petitioner also sought to obtain positive publicity from its customers, maintain customer goodwill, alleviate cash-flow problems, and maintain its

reputation as a top quality coach manufacturer. Petitioner also used its incentive program to attract buyers for coaches with unpopular colors or unpopular sizes and display models that had been driven to recreational vehicle shows. The "X" brand manufacturers also offered incentive programs to the Foretravel dealerships.

One facet of petitioner's incentives began when Mr. Fore operated the California dealership. The California dealership would purchase Foretravel coaches for sale to customers. At times, customers would make Mr. Fore an offer on a Foretravel coach, but the purchase price proposed by the customer would be less than the price the California dealership paid petitioner for the coach. Mr. Fore would call Moore at Foretravel and ask him if petitioner was interested in such a sale. If petitioner was interested in selling the coach at the customer's suggested price, then petitioner would make a commensurate adjustment in its price to the dealer via the Foretravel incentive program. This incentive method still was in place during the years in issue and was available to a dealer faced with a customer offer that produced a loss or resulted in a "skinny deal".

A "skinny deal" is a transaction that has a $3,000 profit or less. A salesperson at the dealership could not turn down any deal proposed by the customer, even a skinny deal. The sales manager at the dealership had the authority, as did the general

manager, to accept any deal with a profit in excess of $3,000.
When the profit fell below $3,000, the dealership had to contact
Foretravel in Nacogdoches to approve the transaction. Franklin
or Moore personally had to approve any loss transaction. If a
used coach was taken in as a trade on the purchase of a
Foretravel coach, then neither petitioner nor the dealership knew
the exact profit or loss until the used coach was sold and, even
then, another used coach might be taken in as a trade.
Difficulty in predicting the resale value of a used coach added
to the uncertainty. Thus, petitioner made one yearend rebate
instead of making an immediate rebate that might have to be
reversed after the sale of the used coach. To maintain a steady
flow of coaches, petitioner would force dealers to accept
inventory so as to avoid the circumstances that petitioner faced
in 1979, when some of the independent dealers refused to accept
new inventory. This refusal interfered with petitioner's ability
to maintain steady production. Petitioner provided the
dealerships with floorplan financing in 1989 and 1990, and
petitioner charged the dealerships interest on this financing.
Thus, the additional inventory would result in additional finance
costs for the dealer. Petitioner would take the additional
inventory and associated finance costs into account when
determining the incentives owed to a dealer.

To obtain positive publicity from its customers, petitioner
would authorize a special deal on a coach for a high profile

motor home owner, such as a leader or organizer of a motor home association or club.  Petitioner felt that having that person own a Foretravel coach could influence other members of that association or club to do the same.  To maintain customer goodwill, petitioner would authorize a special deal or a favorable trade on another Foretravel model when a customer returned a coach and complained of poor quality.  To alleviate temporary cash-flow problems, petitioner might allow a dealer to sell a new or used coach financed by petitioner at a discount in order to generate cash-flow to petitioner.  To maintain its reputation as a top quality or "highline" coach manufacturer, petitioner established relatively high wholesale and suggested retail prices.  The yearend incentive payments allowed petitioner to maintain its position in the public's eye as a top quality coach manufacturer while reducing the wholesale cost of the coach to the dealer when necessary.  Petitioner also believed that a firm wholesale price provided salespeople with a floor that they could use to negotiate with customers.

Petitioner took all of the various factors discussed above into account when determining the incentive payment for the dealerships.  Petitioner had no written policy as to the amount of the incentive paid to each dealer.  Franklin and Moore discussed throughout the year the various transactions that would give rise to a rebate.  At the end of petitioner's fiscal year, Franklin again discussed the various transactions with Moore, and

then Moore would decide the amount of the rebate to each dealer.

Petitioner also paid incentives to independent dealers that sold Foretravel coaches, but those incentives were not necessarily identical to the incentives paid to petitioner's subsidiaries. The incentives petitioner paid to the various subsidiaries were not necessarily identical either, in part because sales fluctuated both seasonally and geographically. Petitioner offered the incentives needed to spur sales at the particular time.

The dealer incentives for the years in issue were as follows:

|  | Rebate for year ended June 30 | |
| Dealer | 1989 | 1990 |
| Arizona | $22,005.18 | -- |
| California | 231,145.18 | $404,321.45 |
| Dallas | 10,488.94 | 953,748.93 |
| Florida | 191,089.37 | 696,004.99 |
| Tennessee | 336,683.04 | 456,060.61 |
| Nacogdoches | 369,261.87 | -- |
| Total: | $1,160,673.58 | $2,510,135.98 |

For 1989, Weaver recorded the incentive payments as a credit to trade accounts receivable and a debit to bad debts on petitioner's books. Weaver recorded the incentive payments as a debit to the bad debts account because he was stretched for time and took a shortcut. He knew that the auditors from Axley & Rode would reclassify or make an adjustment to the entries where appropriate. In 1989, Moore directed Weaver to record the incentive payments as a credit to trade accounts receivable from

the subsidiaries, because Moore felt that this would be advantageous to petitioner for financial reporting purposes. This resulted in a writeoff of the entire balance of petitioner's trade account receivables for the fiscal year ended June 30, 1989.

For 1990, Weaver recorded the incentive payments as a credit to unit receivables and a debit to bad debts on petitioner's books. Moore did not instruct Weaver how to record the incentive payments for 1990. Weaver believed the credit to unit receivables was the correct entry on petitioner's books because the incentive was being matched to the sales of units as reflected in the unit receivables. He thought a journal entry debiting sales, which petitioner had done in prior years with a credit memo, would not be proper without a credit memo.

Golden supervised Axley & Rode's preparation of petitioner's financial statements for its fiscal years ended June 30, 1989, and 1990. Even before he became managing partner of the Foretravel account in 1987, Golden knew that petitioner had a rebate policy. After the audit group from Axley & Rode completed the financial statements, the relevant information was turned over to Axley & Rode's tax department to prepare the tax returns. Golden then reviewed the completed tax returns.

For the years in issue, Golden was aware that the account Weaver labeled as bad debts also contained the rebates to the various dealerships. Golden treated the bad debt account as a

suspense account that needed to be adjusted later in order to reclassify the rebates. Golden did not reclassify the incentive payments for financial accounting purposes because he felt that doing so would not change the consolidated financial statements prepared by Axley & Rode. Golden failed to reclassify the rebates, and when the Axley & Rode tax department prepared petitioner's Federal corporate income tax returns, nothing indicated that rebates to the dealers existed. When Golden reviewed the completed tax returns, he compared the results with preliminary calculations he made using the financial statements, but he failed to notice that the incentive payments had not been reclassified. Weaver reviewed petitioner's Federal corporate income tax returns for the years in issue, but he failed to realize that Axley & Rode had not reclassified the incentive payments. As a result, petitioner reported the rebates as bad debts on its tax returns for the years in issue. The incentive payments were booked on the subsidiaries' financial statements for the years 1989 and 1990 as other income. For the years in issue, the subsidiaries reported the incentive payments as income in an amount equal to the bad debt deductions taken by petitioner.

OPINION

Deduction for Payments Made in Connection With Northwest

The differences between the parties come down to a basic difference in the analysis and interpretation of the events that

transpired between petitioner and Northwest during the fiscal year ended June 30, 1989. Respondent looks at the events during this period, and particularly the advances made by petitioner to Northwest, as being either loans which created debt or contributions to capital. Respondent views petitioner as a stockholder of Northwest and analyzes the advances by petitioner to Northwest under the traditional debt-equity considerations. See Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972) (applying 13 debt-equity factors). Using that approach, respondent concludes that no bona fide debtor-creditor relationship between petitioner and Northwest was created after October 10, 1988, because the advances and extensions of credit by petitioner to Northwest after that date were worthless when made. See Putnam v. Commissioner, 352 U.S. 82, 88 (1956) (taxpayer who voluntarily buys a debt with knowledge that he will not be paid is considered not to have acquired a debt).

Petitioner, on the other hand, views the transactions during this period as an attempt to bail out and salvage a dealership that was important to petitioner. Northwest covered a territory which had substantial potential. Prior to the years in issue, Northwest had been profitable and responsible for many sales of petitioner's motor coaches. Petitioner wanted to keep Northwest as a healthy, profitable dealership because of its own self-interest in selling motor coaches. As the scenario further developed and the bankruptcy of Northwest became a real

possibility, petitioner was seriously concerned about the effect that this development would have on its reputation among owners and potential owners of Foretravel coaches. Petitioner's original acquisition of 51 percent of the stock of Northwest from Fishfader was made in order to keep Northwest in existence. The 51-percent ownership was not intended to be permanent; it was expected that the stock would be sold to Nicholson and that petitioner would be out of the picture in terms of stock ownership. As the facts set forth above indicate, this did not happen. In fact, the situation went the other way, and Nicholson began to develop financial problems. Petitioner's officers believed in their best business judgment that petitioner should advance cash to Northwest to help Northwest stay viable. As the situation developed, matters went from bad to worse, all as outlined above. Petitioner continued to respond to each new crisis with more cash for the reasons already set forth. Petitioner got into the Northwest situation deeper and deeper as problems developed. Petitioner argues that the advances made were for the purpose of bailing out and salvaging Northwest, all for the business purposes and best interests of petitioner. Petitioner also argues that the amounts advanced to Northwest should be deductible either as bad debts or as uncollectible accounts receivable, or some combination thereof, without regard to the usual criteria for creating a debt.

Respondent concedes that the debts associated with Northwest and accrued by petitioner prior to October 10, 1988, are deductible as bad debts. Respondent argues that the funds advanced and the units shipped after October 10, 1988, were capital contributions. Thus, of the $2,698,658.73 bad debt deduction taken by petitioner for the year ended June 30, 1989, only $1,933,944.10 remains in dispute. The $1,933,944.10 consists of the note given to petitioner by Northwest dated October 11, 1988, in the amount of $345,000, the note dated November 4, 1988, in the amount of $385,000, and the note dated May 24, 1989, in the amount of $132,390.10, with petitioner's accounts receivable for units shipped to Northwest after October 11, 1988, making up the balance of $1,071,604. The parties agree that all of the amounts due petitioner from Northwest on June 30, 1989, were worthless at that time.

Section 166(a) provides that there shall be allowed as a deduction any debt which becomes wholly or partially worthless within the taxable year. The taxpayer bears the burden of proving entitlement to a claimed bad debt deduction. Rule 142(a); Crown v. Commissioner, 77 T.C. 582, 598 (1981).

We must evaluate whether there was a genuine intention to create a debt, with a reasonable expectation of repayment, and whether that intention comports with economic reality. Litton Business Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973);

Baldwin v. Commissioner, T.C. Memo. 1993-433.  In making this determination we will not ignore the realities of the business world.  Santa Anita Consol., Inc. v. Commissioner, 50 T.C. 536, 550 (1968); C.M. Gooch Lumber Sales Co. v. Commissioner, 49 T.C. 649, 656 (1968), remanded pursuant to stipulation of the parties 406 F.2d 290 (6th Cir. 1969).  We agree with petitioner's analysis of what happened and decline to substitute respondent's different business judgment.

Our first point of departure from respondent's analysis is the significance given to petitioner's ownership of Northwest's stock.  Respondent has overemphasized this fact.  Petitioner was not interested in owning Northwest but agreed to purchase the initial 51 percent primarily to keep a Foretravel dealer in that region.  Petitioner and Nicholson entered into a repurchase agreement giving Nicholson the option after 3 years to repurchase petitioner's 51-percent stock holdings.  In November 1988, Nicholson delivered the remaining 49 percent, along with patent rights, to petitioner as collateral for petitioner's receivables. The patent rights proved to be of no value.  Nicholson eventually surrendered ownership of the remaining 49 percent in January 1989.  Thus, petitioner's ownership of the Northwest stock was by default rather than by design.

There is no dispute that petitioner guaranteed the financing from Chrysler First in the normal course of petitioner's trade or business of selling motor homes.  A guarantor of a corporate

obligation may not deduct the payment to satisfy the guarantee if, considering the circumstances when the guarantee was created, the payment constitutes a contribution to capital. Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712, 722-723 (5th Cir. 1972), affg. T.C. Memo. 1970-182. We are satisfied that the guarantee, originally entered into with Idaho First on September, 9, 1985, was bona fide. Prior to that date, Fishfader guaranteed Northwest's financing, and Northwest showed signs of promise. We conclude that petitioner's payments pursuant to the guarantee agreement were properly deducted by petitioner as bad debts.

Respondent concedes that the transactions before October 10, 1988, created bona fide debts. We do not agree with respondent that the debt-equity analysis begins at ground zero on October 10, 1988. Forcing petitioner to run the entire debt-equity gauntlet for every transaction after October 10, 1988, is artificial and ignores the facts of this case. We focus on the events that transpired between early 1988 and June 30, 1989.

In April 1988, Northwest wrote checks payable to petitioner that the bank rejected due to insufficient funds. In October 1988, Franklin learned that Northwest was out of trust and that Chrysler First expected payment from petitioner on the floorplan guarantee.

The entire motor home industry suffered a slowdown in the spring of 1988, as indicated by Northwest's competitors' selling new coaches at cost or below cost in an attempt to move

inventory.  Thus, petitioner could reasonably expect to see losses surface during this market slowdown.   After learning about Northwest's financial setbacks, Franklin and Wilcox traveled to Coeur d'Alene, Idaho, to assess the situation at Northwest.  After observing some of the fundamental problems at Northwest, Wilcox returned to Northwest in November 1988 and placed supervisory and financial controls on Northwest's operations.  Petitioner obtained additional collateral from Nicholson, patent rights, and his Northwest stock, and petitioner sent Clark to Coeur d'Alene so that she could manage the business side of Northwest.

We find petitioner's response reasonable especially in light of the fact that petitioner exerted no management or financial controls over Northwest prior to the fall of 1988.  Petitioner's officers decided to assist a dealership that provided an outlet for petitioner's products in a profitable region.  Petitioner provided loans to Northwest and applied financial and management controls over Northwest's operations when additional problems surfaced.  Petitioner engaged Axley & Rode for advice and assistance in evaluating Northwest's financial condition.  Given Northwest's success prior to the market slowdown in the spring of 1988, petitioner reasonably could conclude that Northwest would be able to pay the amounts advanced.  See Baldwin v. Commissioner, T.C. Memo. 1993-433.  Petitioner properly deducted the disputed amounts as bad debts.

Foretravel's Incentive Program

Petitioner argues that the incentive payments to the dealerships are excludable from gross income, or in the alternative, are deductible as ordinary and necessary business expenses. Respondent argues that in substance petitioner's incentive payments were contributions to capital and were not reductions in sales prices or deductible under section 162. We agree with petitioner.

Petitioner concedes that it erroneously claimed the incentives as bad debts for both years in issue. This fact is not fatal to petitioner's claim that the payments were actually incentive payments where, as here, petitioner provides thorough and credible evidence showing that the payments were mistakenly reported as bad debts. We look at the true nature of the payments despite the labels and bookkeeping entries used by petitioner. B. Forman Co. v. Commissioner, 453 F.2d 1144, 1160 (2d Cir. 1972) affg. in part, revg. in part and remanding 54 T.C. 912 (1970); Burnett v. Commissioner, 356 F.2d 755 (5th Cir. 1966), remanding 42 T.C. 9 (1964).

Respondent argues that the incentive payments, or rebates, are not excludable from petitioner's gross income or deductible expenses because the payments were unrelated to performance, and there was no set sales volume that the dealer had to meet in order to qualify for a rebate. Respondent, citing Sun Microsystems, Inc. v. Commissioner, T.C. Memo. 1993-467, contends

that, in order to qualify as a volume discount, the discount must be set forth in a formula, and the volume of product to be purchased in order to qualify for the discount must be specified. However, the discounts here are not volume discounts. Many different arrangements can constitute a reduction in sale price. Cf. Max Sobel Wholesale Liquors v. Commissioner, 630 F.2d 670, 671-672 (9th Cir. 1980), affg. 69 T.C. 477 (1977); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 489-492 (1980); Haas Bros., Inc. v. Commissioner, 73 T.C. 1217 (1980); Tri-State Beverage Distribs., Inc. v. Commissioner, 27 T.C. 1026, 1029-1031 (1957); Pittsburgh Milk Co. v. Commissioner, 26 T.C. 707 (1956); Convergent Technologies, Inc. v. Commissioner, T.C. Memo. 1995-320. In Mississippi Chem. Corp. v. Commissioner, 86 T.C. 627, 640 (1986), we noted that the common thread running through Max Sobel, Dixie Dairies, Haas Brothers, and Pittsburgh Milk is that there was an agreement between the taxpayer and its customers, entered into prior to the sale of the product, providing for the refund of some part of the purchase price. We are satisfied that this common thread runs through the rebates paid by petitioner to its dealers.

There is no doubt that the various facets of petitioner's rebate program did not lend themselves to expression by a numerical formula. Nonetheless, if the individual factors separately would qualify as a purchase price reduction, then the factors taken as a whole would qualify as a purchase price

reduction.  Petitioner offered rebates of the finance costs imposed on a dealer from additional inventory, and also used incentives to attract buyers for coaches with unpopular colors or unpopular sizes and display models that had been driven to recreational vehicle shows.  Petitioner did not offer the rebate up front to the dealer, but instead sold these coaches to the dealer at full price and then would accept a lower price from the dealership if the need arose.  In this circumstance, there was an understanding between Foretravel and its customers, the dealerships, entered into prior to the sale of the product to the ultimate user of the product.  If the dealership could immediately sell a coach at full retail price despite its unpopular size or color, it would do so; if it could not, then the dealership could sell the coach for less than retail with a commensurate rebate to the dealership approved by petitioner.

The incentives generated by sales to high profile buyers, or buyers who complained about the quality of a Foretravel coach, also qualified as a purchase price reduction between petitioner and the dealers.  The reality of the marketplace would dictate the rebate needed to put the product in the hands of the consumer.  If a high profile buyer offered the dealership full retail price, then there was no reason for petitioner to reduce the sale price of the coach to the dealer.  The more reasonable method was the method used by petitioner and its dealers whereby petitioner would adjust the price to the dealer via a rebate if

necessary, and then the dealer would in turn adjust the retail price to the consumer.

The rebates offered to dealers when petitioner was in need of cash also qualify as purchase price reductions between petitioner and the dealers. Petitioner needed cash, and petitioner had extended credit to the dealer. Petitioner offered the dealer a rebate with the general understanding that the dealer would reduce the retail price to the consumer. The sale to the consumer put cash in the dealer's hands, which enabled the dealer to reduce the credit balance owed to petitioner. Petitioner's need for cash and the rate of sales at the retail level, coupled with the price the consumer was willing to pay the retailer for a coach, would determine the rebate needed, if any, to put the product into the hands of the consumer.

These factors highlight why a numerical formula setting forth the amounts of the rebates may not be practicable in all instances. The fact that a dealer may receive a used coach as a trade exacerbates the uncertainty, because the used coach must be valued in order to determine the amount realized by the dealer at the retail level. The product sold by petitioner is unique, and the particular rebates needed to move merchandise into consumers' hands could fluctuate to such an extent that the rebates could be determined appropriately only on a transaction-by-transaction basis. We conclude that petitioner's failure to reduce its rebate policy into a numerical formula is not fatal to

petitioner's claim of a rebate, because petitioner was the sole manufacturer of a unique product, particular purchasers might be prospects for a rebate offer from the manufacturer while others might not, the retail price was subject to negotiation between the consumer and the distributor, and the demand for the unique products offered by petitioner fluctuated geographically and seasonally.

Petitioner offered detailed testimony setting forth the factors taken into account in its incentive program and the objectives it intended to accomplish through its incentive program, and we conclude that the disputed payments were bona fide incentive payments made in furtherance of those various objectives. We conclude that the incentive payments are excludable from petitioner's gross income as a reduction in the sale price of coaches.

We are mindful of respondent's position that transactions between related parties should be subject to close scrutiny because they may engage in transactions that are not arm's length. See C.M. Gooch Lumber Sales Co. v. Commissioner, 49 T.C. at 656; Hall v. Commissioner, 32 T.C. 390, 407 (1959), affd. 294 F.2d 82 (5th Cir. 1961). Respondent has shown that the incentive payments by petitioner to its dealers for the year ending June 30, 1989, consisted of the entire balance of petitioner's trade account receivables recorded on petitioner's books. However, we do not consider this conjunction of numbers to be fatal in the

year ending June 30, 1989.  We conclude that Moore arrived at the figure for incentive payments taking into account the many considerations set forth above.

Additions to Tax

As a result of our findings above, we need not address the additions to tax.

To reflect the foregoing and the concessions by the parties,

Decision will be entered

under Rule 155.
