T.C. Memo. 1996-548


UNITED STATES TAX COURT


AMERICAN UNDERWRITERS, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14263-95.              Filed December 18, 1996.


        P and K are related corporations that bought and
sold securities for their own accounts.  P and K
invested primarily in an innovative and risky type of
option, and P and K guaranteed each other's investment
in the options.  P transferred money to K, or to
brokerage firms on K's behalf.  P recorded these
transfers as "loans".  On Oct. 19, 1987, stock prices
dropped 50 percent, and P and K suffered extraordinary
losses on that day.  For its 1987 taxable year, P
deducted $5 million of the advances to K as a bad debt.
<u>Held</u>:  The advances were debt.  <u>Held</u>, <u>further</u>:  The
$5 million debt became worthless in the year of the
deduction.  <u>Held</u>, <u>further</u>:  P is not liable for the
additions to tax determined by R.

Alfred Roven (an officer) and Joy Martin (specially recognized), for petitioner.

Rebecca T. Hill and Bryce A. Kranzthor, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge: American Underwriters, Inc., petitioned the Court to redetermine respondent's determination with respect to its 1987 and 1988 taxable years. For petitioner's taxable year ended February 29, 1988, respondent determined a $1,012,554 deficiency and a $53,188 addition thereto under section 6653(a)(1)(A). Respondent also determined that the time-sensitive provision of section 6653(a)(1)(B) applied to the entire deficiency. For petitioner's taxable year ended February 28, 1989 (petitioner's 1988 taxable year), respondent determined a $261,672 deficiency and a $13,084 addition thereto under section 6653(a)(1).

Following concessions, we must decide:

1. Whether certain advances were debt. We hold they were.

2. Whether any of these advances were worthless as of February 29, 1988. We hold they were to the extent described herein.

3. Whether petitioner is liable for the additions to tax determined by respondent. We hold it is not.

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the subject years. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and exhibits submitted therewith are incorporated herein by this reference. Petitioner's principal place of business was in San Anselmo, California, when it petitioned the Court.

Petitioner was organized by Alfred Roven (Mr. Roven) on October 20, 1980, primarily to transact business in the securities market, buying and selling securities, bonds, and derivatives, among other things. Mr. Roven is petitioner's sole shareholder, as well as its president and one of its two directors. Joy Martin (Ms. Martin) is petitioner's other director, and she is its secretary and bookkeeper.

Mr. Roven organized Kenilworth Corp. (Kenilworth), on January 12, 1982, to trade securities and to provide consulting services on the trading of securities. Mr. Roven owns 40 percent of Kenilworth's stock, and its remaining stock is equally owned by two of his children. Kenilworth's taxable year ends on May 31, and it began filing a consolidated income tax return with a lone subsidiary effective with its taxable year ended May 31,

1988 (Kenilworth's 1987 taxable year).[1]  Kenilworth had $1,000 of capital stock outstanding at the beginning and end of its 1987 taxable year.

During all years relevant herein, petitioner and Kenilworth invested primarily in Limited Price Options (LPO's) sold by Bear, Stearns & Co., Inc. (Bear Stearns), and Prudential Bache & Co. (Prudential Bache).  An LPO is an extremely high risk, sophisticated financial instrument designed for aggressive hedge funds, risk arbitageurs, and professional traders.  In general, a purchaser of an LPO pays 20 percent of the market value of a package of securities in return for the right to buy those securities at a set price during a set period of time.  Once purchased, an LPO may be traded only with the brokerage firm from which it was purchased.  An LPO is like a conventional option in that it creates leverage to enhance the purchaser's potential gain in a strong market.  However, the premium paid for an LPO is generally lower than the premium paid for a comparable conventional option because the terms of the LPO provide that it will automatically expire without value whenever the market value of the related securities falls below a set dollar amount (Expiration Price).  To minimize the risk of loss in a declining market, a purchaser of an LPO may execute an addendum to an LPO

---

[1] Kenilworth acquired more than 50 percent of the stock of this subsidiary during Kenilworth's 1987 taxable year.  Unless otherwise indicated, our references to Kenilworth are without regard to its subsidiary.

contract, under which the seller/brokerage firm will repurchase the LPO and issue a new one (for an additional cost) whenever the value of the related securities equals the Expiration Price.

Bear Stearns acquired the underlying securities for the LPO's that it sold to petitioner or Kenilworth. When Bear Stearns sold an LPO to petitioner or Kenilworth, Bear Stearns charged the purchaser a purchase commission that was based on the gross cost of the underlying securities. When the purchaser exercised or otherwise disposed of the LPO, Bear Stearns charged the purchaser a selling commission based on the gross proceeds of the securities. Prudential Bache followed a similar, overall procedure with respect to the LPO's that it sold to petitioner or Kenilworth.

Pursuant to the terms of the LPO's purchased by petitioner or Kenilworth, the Expiration Price was set at an amount that reflected a 3 percent decline in the value of the related securities. Under the terms of the addendums that petitioner or Kenilworth entered into with the seller/brokerage firm, the seller would: (1) Repurchase an LPO every time that the market value of the related securities equaled the Expiration Price and (2) simultaneously issue a new LPO for the same securities, the payment of which was due on the day of issuance. The repurchase price of an LPO equaled the amount by which the proceeds received from selling the underlying securities (usually the market price less commissions and other costs) exceeded the exercise price for

that day.  If the purchaser failed to transfer the requisite funds to the seller within the required period of time, the LPO would cancel and the seller would retain all of the funds that the purchaser had previously paid to purchase it.

Mr. Roven directed the trading activities of petitioner, Kenilworth, and certain other related entities that are not directly relevant to our decision herein.  Mr. Roven caused petitioner (or, sometimes, one of the other related entities) to buy the positions in his recommended securities (including LPO's), and he divided the interests in these positions among the entities in a preset manner.  All purchases of LPO's with the funds of petitioner were contemporaneously recorded as "loans" to Kenilworth and the other related entities to the extent that each entity (including Kenilworth) benefited therefrom.  None of these "loans" (hereinafter referred to as advances) were evidenced by a written agreement (e.g., a note) because Mr. Roven did not believe that he needed to prepare one, given the fact that he controlled all of the entities and they were commonly owned.  For the same reason, none of the advances were directly secured, and none of the entities paid interest on any of the advances.

Petitioner and Kenilworth considered the advances to be debt that was payable on demand without a set maturity date, and they intended at the time of each advance that it would be repaid shortly after it was made.  Prior to October 19, 1987, Kenilworth regularly repaid each advance shortly after it received the

advance. On October 19, 1987, the Dow Jones industrial average fell 22.6 percent (hereinafter, this fall is referred to as the Crash), which was the worst decline since World War I and greater from a numerical standpoint than the 12.82 percent drop on October 28, 1929. Some stocks dropped 50 percent on that day, and petitioner and Kenilworth's 3 percent trigger for repurchase of the LPO's was hit 15 times, resulting in extraordinary losses to them. Kenilworth lost at least $23.6 million on the day of the Crash, mainly with respect to its LPO's.

Before the Crash, petitioner and Kenilworth had entered into cross-collateral and guarantee agreements with Bear Stearns and Prudential Bache under which: (1) Every LPO owned by petitioner was collateralized by an LPO owned by Kenilworth, and vice versa, and (2) petitioner was liable for any charges incurred by Kenilworth on its purchase of an LPO, and vice versa. Mr. Roven approved all of these agreements. Petitioner and Kenilworth were both financially healthy and profitable when they signed these agreements, and they entered into these agreements with a proper and valid business purpose, both providing consideration for the agreements and receiving value therefrom. Petitioner's primary business purpose was to increase its profits and net worth, and petitioner realized this purpose until the Crash. The Crash caused the leverage which had allowed petitioner and Kenilworth to grow extraordinarily during 1986 and 1987 to backfire and generate extraordinary losses to the two entities.

In addition to the advances mentioned above, petitioner transferred money to Kenilworth or to other parties (e.g., Bear Stearns and Prudential Bache) on Kenilworth's behalf. Petitioner treated these transfers similarly to the advances above. These transfers were contemporaneously recorded in petitioner's books as "loans", and petitioner intended at the time of each transfer that the transfers would be repaid by Kenilworth. Both petitioner and Kenilworth treated these transfers as demand loans, and Kenilworth regularly repaid all of these transfers within 90 days of the transfer. Prior to the Crash, petitioner received timely repayment of all of its debts that were due from Kenilworth. (Hereinafter, we collectively refer to the transfers and advances as advances.)

Kenilworth owed petitioner over $18 million in advances as of the last day of Kenilworth's 1987 taxable year. Petitioner had advanced Kenilworth approximately $15 million of this sum to support the cross-collateral and guarantee agreements. Petitioner's board of directors (Board), following its evaluation of the receivable from Kenilworth in consultation with advisers (including petitioner's independent accountant (C.P.A.), a certified public accountant who was extremely familiar with the business and operation of petitioner, of Kenilworth, and of the other related entities), unanimously agreed at a duly held board

meeting to forgive $5 million of the advances to Kenilworth.[2]
The C.P.A. had discussed with the Board whether all of the
advances to Kenilworth were worthless, and he had queried whether
petitioner could forgive the entire amount as a bad debt.  The
Board concluded conservatively that the uncollectible advances
totaled $5 million.  The Board believed that Kenilworth could not
repay this amount because it had a negative net worth as of
February 28, 1988, and Bear Stearns had canceled most (if not
all) of Kenilworth's LPO's on October 19, 1987.  The Board also
considered the composition of Kenilworth's assets, as well as
certain claims that it could make in regard to its trading
activities and the likelihood of success with respect thereto.

---

[2] Petitioner's minutes for this meeting state as follows:

> During the fiscal year ended February 28, 1988
> through the normal course of its business activities,
> American Underwriters, Inc. has loaned the sum of
> $18,096,100.00 (Eighteen Million Ninety Six Thousand
> and One Hundred Dollars) to Kenilworth Corporation,
> Inc.

> As a result of the sharp downturn in the equities
> market during the month of October, 1987, Kenilworth
> Corporation, Inc. incurred extreme financial losses
> that strained its liquidity to the point of questioning
> its ability to continue its business operations as a
> viable going concern.  In consideration of the above
> circumstances, American Underwriters, Inc. and
> Kenilworth Corporation Inc., formally agree to a
> partial relief of the debt obligation owed by
> Kenilworth Corporation, Inc. to American Underwriters,
> Inc. for the amount of $5,000,000.00 (Five Million
> Dollars).

Before the Board forgave the $5 million amount, but after the Crash, petitioner had made a formal demand upon Kenilworth to repay all moneys that it owed petitioner (including the advances). Kenilworth was unable to honor this demand. Before the Crash, Kenilworth had honored all of its obligations to petitioner, and petitioner had always transferred money to or for the benefit of Kenilworth with the belief that it would repay petitioner in full.

Following the Crash, Kenilworth's primary asset was a piece of real estate. Petitioner continued to transfer money to Kenilworth for its trading operation, and Kenilworth continued to make timely payments on a debt that encumbered the real estate. On September 12, 1988, Kenilworth sold the real estate for $481,554, and it paid petitioner the largest portion of the sales proceeds. The amount paid did not reduce the amount considered owed below $5 million.

For its 1985 through 1988 taxable years, Kenilworth reported pre-NOL and pre-special deduction taxable income (loss) on its Federal income tax returns equal to ($1,323), $234,590, ($6,943,436), and ($4,038,323), respectively. It reported the following "gross receipts" and "cost of goods sold":

| Taxable Year | Gross receipts | Cost of goods |
|---|---|---|
| 1985 | $86,736,153 | $86,068,552 |
| 1986 | 249,750,510 | 247,641,780 |
| 1987 | 193,311,229 | 201,493,250 |
| 1988 | 200,329,220 | 202,253,502 |

It reported the following unappropriated retained earnings at the beginning and end of each taxable year:

| Taxable Year | Beginning of year | End of year |
|---|---|---|
| 1985 | $168,435 | $165,535 |
| 1986 | 165,535 | 400,485 |
| 1987 | 400,485 | (971,002) |
| 1988 | (971,002) | (6,858,975) |

Petitioner reported negative taxable income on each of its 1985 through 1988 Federal income tax returns.  Petitioner also reported the following "gross receipts" and "cost of goods sold":

| Taxable Year | Gross receipts | Cost of goods |
|---|---|---|
| 1985 | $307,524,610 | $307,404,014 |
| 1986 | 521,391,751 | 520,838,947 |
| 1987 | 369,142,037 | 367,746,493 |
| 1988 | 175,924,620 | 175,473,765 |

On November 16, 1987, petitioner and the related entities signed a settlement agreement with Bear Stearns, in which the parties agreed to resolve all of their differences by Kenilworth's paying Bear Stearns a $2.5 million debt owed to Bear Stearns.  Pursuant to this settlement agreement, all of the other claimants paid or received nothing.

On April 29, 1988, Kenilworth filed a claim for arbitration against Prudential Bache with the New York Stock Exchange, Inc., in which it alleged that Prudential Bache owed it over $3 million as a result of transactions occurring in October 1987. Petitioner and the other related entities later joined the claim on the side of Kenilworth, and Prudential Bache filed a

counterclaim against petitioner and the other related entities praying for the sum of $5,302,901.31. On January 31, 1991, the claim and counterclaim were denied in their entirety, and each side bore its own costs and attorney's fees.

Petitioner's 1987 and 1988 Federal income tax returns were prepared by the C.P.A. In connection therewith, Ms. Martin gave the C.P.A. the books and records of petitioner, Kenilworth, and the other related entities.[3] Petitioner's 1987 return reported a deduction for a $5 million bad debt. Respondent disallowed this deduction, stating in the notice of deficiency that "It has been determined that a $5,000,000 bad debt loss claimed in the tax year ended February 29, 1988, is not deductible because it does not qualify under sections 162 or 165 of the Internal Revenue Code."

## OPINION

The primary issue before the Court is whether petitioner may deduct $5 million of the advances that it claims were loans to Kenilworth, and that it claims were worthless at the end of its 1987 taxable year. Respondent determined that petitioner could not deduct any of this amount as either: (1) An ordinary and necessary business expense under section 162 or (2) a loss under

---

[3] Ms. Martin reconciled each broker and bank statement at the end of each business day, and she met with Mr. Roven daily to assure the accuracy of her reconciliations and the other business records. At these meetings, Ms. Martin and Mr. Roven also discussed that day's transactions, and he directed her to make an intercompany transfer of funds to the entities that needed cash.

section 165.  Respondent's counsel, during her opening statement at trial, conceded that a loss occurred, but she disputed: (1) The amount of the loss, (2) that the advances were loans, as opposed to contributions to Kenilworth's capital, and (3) that Kenilworth intended to repay the advances, to the extent they were loans.  On brief, respondent primarily argues that the advances were not loans because they bear none of the formal indicia of debt.  According to respondent, petitioner and Kenilworth classified the advances as loans when they prepared their income tax returns because they wanted to transfer losses between themselves.  If the advances were loans, respondent alternatively argues, the loans were not worthless because Kenilworth was solvent at the time of forgiveness.

1.  Debt or Contribution to Capital

A taxpayer may deduct any debt that becomes wholly or partially worthless during the taxable year.  Sec. 166(a).  The term "debt" connotes a bona fide debtor-creditor relationship that obligates the debtor to pay the creditor a fixed or determinable sum of money.  Sec. 1.166-1(c), Income Tax Regs.  Capital contributions are not debt.  Capital contributions are equity.  Roth Steel Tube Co. v. Commissioner, 800 F.2d 625, 629 (6th Cir. 1986), affg. T.C. Memo. 1985-58; Calumet Indus., Inc. & Subs. v. Commissioner, 95 T.C. 257, 284 (1990).

A taxpayer must establish the validity of a debt before any portion of it may be deducted under section 166.  American

Offshore, Inc. v. Commissioner, 97 T.C. 579, 602 (1991).  Whether a transfer creates a debt is a question of fact, for which the taxpayer bears the burden of proof.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Bauer v. Commissioner, 748 F.2d 1365, 1368 (9th Cir. 1984), revg. T.C. Memo. 1983-120; A. R. Lantz Co. v. United States, 424 F.2d 1330, 1334 (9th Cir. 1970); Crown v. Commissioner, 77 T.C. 582, 598 (1981); Gilbert v. Commissioner, 74 T.C. 60, 64 (1980).  The key to this factual determination turns primarily on the taxpayer's actual intent, as shown by the circumstances and condition of the transfer. Bauer v. Commissioner, supra at 1367-1368; A. R. Lantz Co. v. Commissioner, supra at 1333.  In passing on this intent, the Court of Appeals for the Ninth Circuit, to which appeal in this case lies, has considered 11 factors.  These factors, which are not equally significant and none of which is controlling by itself, are:  (1) The names given to the certificates evidencing the indebtedness, (2) the presence or absence of a fixed maturity date, (3) the source of payments, (4) the right to enforce the payment of principal and interest, (5) participation in management as a result of the advances, (6) a status of the advances equal to or inferior to that of regular corporate creditors, (7) the intent of the parties, (8) the identity of interest between creditor and stockholder, (9) a thin or adequate capitalization, (10) the ability of the corporation to obtain loans from outside sources, and (11) the payment of interest only

out of dividend money.  Hardman v. United States, 827 F.2d 1409, 1411-1412 (9th Cir. 1987); Bauer v. Commissioner, supra at 1368; A. R. Lantz Co. v. United States, supra at 1333.  These factors help distinguish:  (1) Shareholders who transfer money to corporations in exchange for equity interests that are repayable based on the corporations' performance, from (2) creditors who transfer money to corporations in return for obligations that are payable regardless of the corporations' performance.  Bauer v. Commissioner, supra at 1367; A. R. Lantz Co. v. United States, supra at 1334.

The above-mentioned factors focus primarily on ascertaining the intent of the parties to the transfer through their objective and subjective expressions.  Bauer v. Commissioner, supra at 1367; A. R. Lantz Co. v. United States, supra at 1333-1334; Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973). In passing on their intent, we ask ourselves:  (1) Did they truly intend to create a debt, (2) was their intention consistent with the economic reality of creating a debtor-creditor relationship, (3) did the transferor reasonably expect to be repaid, and (4) would an unrelated lender have advanced money to the transferee in the same amount and on the same terms.  Litton Bus. Sys., Inc. v. Commissioner, supra at 377.  We look to the substance of the transfer, rather than its form.  Gregory v. Helvering, 293 U.S. 465 (1935); Hardman v. United States, supra at 1411.  We apply special scrutiny in cases such as this one,

where the transferor and transferee are related. Hardman v. United States, supra at 1412. The mere fact that the transferor and the transferee are related, however, does not necessarily mean that any transfer between them lacks economic substance. Id.

Based on our careful review of the entire record, and after evaluating each of the 11 factors mentioned above, we answer the four questions set forth immediately above in the affirmative. The record points to the conclusion that the advances were loans from petitioner to Kenilworth. Although the tangible documentation for the advances is less than complete, we conclude from the record that petitioner and Kenilworth intended to create a debtor-creditor relationship, that their intent was consistent with the economic reality of creating a debtor-creditor relationship, that petitioner wanted Kenilworth to repay each advance timely and expeditiously, that Kenilworth intended to repay each advance in that manner, and that an unrelated lender would have advanced funds to Kenilworth in a fashion similar to that employed by petitioner.

Before setting forth our analysis of the 11 factors, we pause briefly to state our view of the relevant witnesses. With respect to Mr. Roven and Ms. Martin, the two witnesses who testified on behalf of petitioner, we find them to be credible in their testimony that the advances were intercompany loans. Whereas respondent would have us minimize their testimony and

sustain her determination mainly because some of the formalities of debt were not present, we refuse to do so.  We find that petitioner's claim to the deduction was strongly supported by their testimony.[4]  See, e.g., Diaz v. Commissioner, 58 T.C. 560, 564 (1972).  We also find that this claim is adequately supported by the 11 factors, our analysis of which is set forth below.

i.   Name of certificate

We look to the name of the certificate evidencing purported debt to determine the "debt's" true label.  The issuance of a debt instrument such as a promissory note points toward debt.  The issuance of an equity instrument such as a stock certificate points toward equity.  Hardman v. United States, supra at 1412.  The mere fact that a taxpayer does not issue a formal debt instrument to evidence a transfer of money will not preclude classifying that transfer as debt.  In such a case, the Court must consider all relevant evidence to determine whether the lack of a formal debt instrument is inconsistent with the taxpayer's claim that the alleged debt is truly debt.  See Estate of Mixon v. United States, 464 F.2d 394, 403-404 (5th Cir. 1972); see also American Offshore, Inc. v. Commissioner, 97 T.C. 579, 602 (1991).  The Court must also take into account the realities of the

_____

[4] In addition to the testimony of Mr. Roven and Ms. Martin, petitioner relies on the testimony of the C.P.A., who was called by respondent.  Although we have some reservations about the contents of the C.P.A.'s work papers, which are included in the record, we find most of his testimony to be credible and persuasive.

business world.  Santa Anita Consol., Inc. v. Commissioner, 50
T.C. 536, 550 (1968).

Kenilworth failed to issue a note to petitioner to evidence
the advances as debt.  Under the facts at hand, however, we do
not consider this failure dispositive.  Not only did Kenilworth
fail to issue petitioner a debt instrument for the advances,
Kenilworth did not issue petitioner an equity instrument.
Moreover, Mr. Roven was the financial officer of both of these
entities, and he testified that the lack of a note stemmed from
his belief that notes were not required to document the advances
as debt.  Petitioner and Kenilworth were commonly controlled, and
petitioner recorded the advances as "loans" at or about the time
of each advance.  In addition, Kenilworth had a history before
the Crash of repaying the advances timely and expeditiously.
Loans between related entities are sometimes agreed upon
informally, without the formality of a note.  See Levenson &
Klein, Inc. v. Commissioner, 67 T.C. 694, 713-714 (1977).  In the
instant setting, we believe that petitioner's recording of the
advances as "loans" supports its argument that the advances are
debt, and that Kenilworth's failure to issue petitioner a formal
instrument of debt is not inconsistent with petitioner's
argument.

This factor favors classifying the advances as debt.

ii.    Fixed maturity date

The presence of a fixed maturity date points toward debt.
The absence of a fixed maturity date usually points toward
equity.  Such an absence tends to show that repayment is more
likely tied to the fortunes of a business.  Hardman v. United
States, 827 F.2d at 1413; American Offshore, Inc. v.
Commissioner, 97 T.C. at 602.  The fact that a fixed maturity
date is absent from a case, however, does not necessarily mean
that a purported debt is actually equity.  In such a case, the
Court must ascertain whether the lack of a fixed maturity date is
explainable or otherwise negated by other evidence in the record.
See Hardman v. United States, supra at 1413.

Because petitioner did not issue notes to evidence the
advances as debt, we do not find a written maturity date for the
advances' repayment.  We find, however, that the advances were
repayable on demand.  It is also relevant that Kenilworth had a
prior history of borrowing money from petitioner for short
periods of time, and of repaying timely these debts.  Estate of
Mixon v. United States, supra at 404.  The same is true with
respect to the fact that petitioner demanded that Kenilworth
repay petitioner all debts (including the advances) due it after
the Crash.  Such a demand for repayment is evidence of a
debtor-creditor relationship.  Montgomery v. United States,
87 Ct. Cl. 218, 23 F. Supp. 130 (1938); see also Sattelmaier v.
Commissioner, T.C. Memo. 1991-597.

This factor is neutral, and we give it no weight.

### iii.  Source of repayment

Repayment that is dependent upon corporate earnings points toward equity.  Repayment that is not dependent on earnings points toward debt.  Hardman v. United States, supra at 1413; Roth Steel Tube Co. v. Commissioner, 800 F.2d 625, 632 (6th Cir. 1986), affg. T.C. Memo. 1985-58; In re Lane, 742 F.2d 1311, 1314 (11th Cir. 1984); American Offshore, Inc. v. Commissioner, supra at 602.  Purported debt is usually equity when its repayment is directly dependent on the profits of the debtor's business. Segel v. Commissioner, 89 T.C. 816, 830 (1987).

Respondent would have us rely primarily on Kenilworth's balance sheets, with particular emphasis on its retained earnings, to conclude that Kenilworth had a minimal net worth on the relevant dates.  We refuse to do so.  Kenilworth's balance sheets are based on historic cost and do not report current value.  We note, however, that Kenilworth had a balance sheet net worth of $400,485 at the beginning of its 1987 taxable year, and that its balance sheet net worth only fell to negative $971,002 at the end of that year, notwithstanding the fact that it lost at least $23.6 million on the day of the Crash.  Contrary to respondent's assertion, we do not believe this factor supports a finding of equity.

This factor is neutral, and we give it no weight.

### iv.  Right to enforce payment of interest and principal

A definite obligation to enforce the payment of principal and interest is evidence of debt.  Hardman v. United States, supra at 1413; American Offshore, Inc. v. Commissioner, supra at 603.  The absence of security for the repayment of purported debt generally points toward equity.  Roth Steel Tube Co. v. Commissioner, supra at 632; In re Lane, supra at 1317.

We find that petitioner could enforce Kenilworth's repayment of the advances.  Although we do not also find that petitioner could enforce the payment of interest, we give this fact little regard.  We believe that Mr. Roven's credible testimony adequately explains the lack of an interest provision from which petitioner could seek enforcement.

We also are untroubled by the fact that petitioner did not receive any type of security for the advances.  Mr. Roven testified that he did not require security because Kenilworth and petitioner were commonly owned.  Moreover, Kenilworth had a solid history of repaying petitioner timely and expeditiously.  We do not believe that the absence of security under the facts at hand precludes a finding of debt on this factor.

This factor is neutral, and we give it no weight.

### v.  Participation and management

If a transferor's right to participate in the management of the transferee corporation increases as a result of the transfer of funds, then the transferor may be a shareholder of the

transferee rather than its creditor.  A transferor's ability to participate in the transferee's management may increase through greater voting rights or a greater ownership interest. Hardman v. United States, supra at 1413; Estate of Mixon v. United States, 464 F.2d at 406; Lundgren v. Commissioner, 376 F.2d 623, 626 (9th Cir. 1967), revg. T.C. Memo. 1965-314; American Offshore, Inc. v. Commissioner, supra at 603.

We find no evidence in the record to suggest that petitioner's right to participate in Kenilworth's management increased as a result of the advances.  We find it unlikely, however, that such an increase could have occurred, given the fact that petitioner had no ownership interest in Kenilworth and that Mr. Roven controlled both entities.

This factor favors classifying the advances as debt.

vi.    Subordination

Subordination of purported debt to the claims of other creditors points towards equity.  Hardman v. United States, supra at 1413; Roth Steel Tube Co. v. Commissioner, supra at 631-632; Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634, 639 (11th Cir. 1984), affg. T.C. Memo. 1982-314.  The fact that an obligation to repay is subordinate to claims of other creditors, however, does not necessarily mean that the purported debt is really equity.  This is especially true when the advance is given a superior status to the claims of shareholders. Estate of Mixon v. United States, supra at  406.

The record contains no persuasive evidence on the order of priority of petitioner's debts to Kenilworth vis-a-vis the latter's other creditors.  We note, however, that petitioner did receive the lion's share of the proceeds from Kenilworth's sale of its real estate following the Crash, which suggests that petitioner held a claim to repayment that was greater than Kenilworth's other creditors and to that of its shareholders.

This factor is neutral, and we give it no weight.

### vii.  Intent of the parties

We analyze all 11 factors to decipher petitioner's and Kenilworth's true intent concerning whether the advances are debt or equity.  Hardman v. United States, 827 F.2d at 1413.  Although their objective expression of intent is important, we do not consider it to be the most important factor and do not give it special weight.  A. R. Lantz Co. v. United States, 424 F.2d at 1333.  We view petitioner and Kenilworth's objective expression of intent as merely one factor to consider in passing on whether they actually intended that the advances be debt.  Id.

Petitioner's witnesses testified unequivocally that the advances were meant to be loans.  We found their testimony to be credible and persuasive, and we do not believe that the lack of a promissory note or other formal indicia of debt deprives their testimony of probative value under the facts herein.[5]  Hardman v.

[5] We also find no merit in respondent's allegation that
(continued...)

United States, supra at 1412; see also Church of Scientology v. Commissioner, 823 F.2d 1310, 1319 (9th Cir. 1987), affg. 83 T.C. 381 (1984); Sun Properties v. United States, 220 F.2d 171, 174 (5th Cir. 1955).

This factor favors classifying the advances as debt.

viii.  Capitalization

Thin or inadequate capitalization points toward equity. Hardman v. United States, supra at 1414.  The same is true with respect to advances which are made to a corporation with an excessive debt to equity ratio.  Roth Steel Tube Co. v. Commissioner, 800 F.2d at 632.  The ratio of debt to equity is measured by comparing the corporation's total liabilities to its stockholders' equity.  Stockholders' equity equals the corporation's assets minus its liabilities.  Bauer v. Commissioner, 748 F.2d at 1368.

The record does not allow us to measure with any precision the ratio of Kenilworth's debt versus its equity on each of the relevant dates.  We also do not know with certainty the ratio of debt versus equity that is commonplace in a business such as Kenilworth's.  Ordinarily, we count any gap in the record against the taxpayer; i.e., the party with the burden of proof.  See Rule 142(a).  In the setting of this case, however, we do not

---

[5](...continued)
petitioner and Kenilworth classified the advances as loans when they prepared their income tax returns because they wanted to transfer losses between themselves.

believe that the small gap in the record as it pertains to this factor counts against petitioner. Petitioner frequently and regularly advanced funds throughout the subject years to or on behalf of Kenilworth, and petitioner has supplied the Court with reams of documents relating to these advances. We could sift through these documents and arrive at fair estimations of the debt to equity ratio on many of the relevant dates. We refuse to do so, however, because we do not believe that these estimations would be meaningful enough to cause this factor to lean in one direction or the other.

This factor is neutral, and we give it no weight.

ix. Identity of interest

Advances made by stockholders in proportion to their respective stock ownership point towards equity. A sharply disproportionate ratio between a stockholder's ownership percentage and the corporation's debt to that stockholder generally points toward debt. Roth Steel Tube Co. v. Commissioner, supra at 630; Estate of Mixon v. United States, supra at 409; American Offshore, Inc. v. Commissioner, supra at 604.

Petitioner did not have a direct stock interest in Kenilworth. Thus, the advances from petitioner to Kenilworth bore no relationship to a stockholding that petitioner had in Kenilworth. Respondent argues that the advances were actually contributions to Kenilworth's capital that were considered made

by its shareholders (i.e., Mr. Roven and his children). According to respondent, the fact that Kenilworth and petitioner were related leads to a presumption that the advances were constructive dividends to Mr. Roven (from petitioner), followed by his constructive contribution to the capital of Kenilworth, which is in part a gift to his children. We are not persuaded by respondent's argument, and the facts of this case do not support it.

This factor favors classifying the advances as debt.

### x. Payment of interest out of "dividend money"

The presence of a fixed rate of interest and actual interest payments points toward debt. The absence of interest payments in accordance with the terms of a debt instrument points toward equity. American Offshore, Inc. v. Commissioner, 97 T.C. 579, 604 (1991).

The advances were repayable without interest. In the normal setting, this fact would indicate that the advances were equity. Mr. Roven testified, however, that he did not believe that he had to pay interest on the advances for them to be debt. We believe that Mr. Roven's credible testimony adequately explains the lack of interest payments in the setting of this case. Given the additional fact that petitioner and Kenilworth intended for all of the advances to be short-term loans, we do not believe that the lack of interest payments supports a finding of equity in this case.

This factor is neutral, and we give it no weight.

### xi.   Inability to obtain financing

The question of whether a purported debtor could have obtained comparable financing is relevant in measuring the economic reality of a transfer. Estate of Mixon v. United States, 464 F.2d at 410. Evidence that the purported debtor could have obtained loans from outside sources points toward debt. Evidence that the taxpayer could not obtain loans from independent sources points toward equity. Calumet Indus., Inc. & Subs. v. Commissioner, 95 T.C. at 287. We look to whether the terms of the purported debt were a "patent distortion of what would normally have been available" to the debtor in an arms-length transaction. See Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. at 379.

The record contains no persuasive evidence on whether Kenilworth could have obtained financing from an unrelated party at the relevant times. Kenilworth's history of making repayments to petitioner, however, is a fact that we believe any reasonable creditor would look favorably upon in deciding whether to loan money to Kenilworth. The same is true with respect to Kenilworth's increased earnings from its 1985 taxable year to its 1986 taxable year. See Bauer v. Commissioner, supra at 1369-1370.

This factor favors classifying the advances as debt.

xii.  Conclusion

Many of the factors favor classifying the advances as debt, and none of the factors supports a classification as equity.  We conclude that the advances are debt.

2.  Worthlessness

Respondent disallowed petitioner's deduction for a $5 million bad debt, stating in the notice of deficiency that petitioner had not established that the deduction qualified under section 162 or section 165.  Respondent argues in her brief that the Court should sustain her disallowance because petitioner has not proven that:  (1) Kenilworth became insolvent during the year of the deduction or (2) petitioner was without a reasonable prospect of recovery during that year.  Petitioner argues that it should be allowed the $5 million deduction primarily because it guaranteed the debt of Kenilworth, and it (petitioner) was forced to transfer these funds to the brokerage firms to satisfy this guarantee.

Taxpayers may currently deduct the amount of any debt that becomes worthless during a given year.  See sec. 166.  A loss sustained by a guarantor unable to recover from the debtor is a loss from a bad debt.  Putnam v. Commissioner, 352 U.S. 82 (1956); Black Gold Energy Corp. v. Commissioner, 99 T.C. 482, 486 (1992), affd. without published opinion 33 F.3d 62 (10th Cir. 1994); Martin v. Commissioner, 52 T.C. 140, 144 (1969), affd. 424 F.2d 1368 (9th Cir. 1970); see also Foretravel, Inc. v.

Commissioner, T.C. Memo. 1995-494.  As the Court explained in

Putnam:

> The reality of the situation is that the debt is an
> asset of full value in the creditor's hands because
> backed by the guaranty.  The debtor is usually not able
> to reimburse the guarantor and in such cases that value
> is lost at the instant that the guarantor pays the
> creditor.  But that this instant is also the instant
> when the guarantor acquires the debt cannot obscure the
> fact that the debt "becomes" worthless in his hands.
> [Putman v. Commissioner, supra at 89.]

Whether a debt is worthless is a factual determination, on

which the taxpayer bears the burden of proof.  Estate of Mann v.

United States, 731 F.2d 267, 275 (5th Cir. 1984); Crown v.

Commissioner, 77 T.C. at 598.  This ordinarily entails proof of

identifiable events that establish that the debt will not be paid

in the future.  Estate of Mann v. United States, supra at 276.  A

taxpayer's subjective opinion that a debt is uncollectible,

standing alone, is not sufficient evidence that the debt is

worthless.  Fox v. Commissioner, 50 T.C. 813, 822  (1968), affd.

per curiam by an unreported order (9th Cir. 1970). Rather,

taxpayers must arrive at a conclusion of worthlessness through

the exercise of sound business judgment, basing their judgment

upon as complete information as is reasonably obtainable.  Andrew

v. Commissioner, 54 T.C. 239, 248 (1970).  Although evidence

demonstrating that the debtor is insolvent points to a conclusion

that a debt is worthless, see Gorman Lumber Sales Co. v.

Commissioner, 12 T.C. 1184, 1192 (1949), insolvency does not

establish conclusively that a debt is worthless, Cimarron Trust

Estate v. Commissioner, 59 T.C. 195, 200 (1972).  Consideration must be given to the debtor's potential for improving its financial position.  Dustin v.  Commissioner, 53 T.C. 491, 502 (1969), affd. 467 F.2d 47 (9th Cir. 1972).

Based on our review of the record, we hold that at least $5 million of the advances was worthless as of the close of petitioner's 1987 taxable year.  See American Processing & Sales Co. v. United States, 178 Ct. Cl. 353, 371 F.2d 842 (1967); see also Baldwin v. Commissioner, T.C. Memo. 1993-433; Moffat v. Commissioner, T.C. Memo. 1965-183, affd. 373 F.2d 844 (3d Cir. 1967).  The record leads us to conclude that Kenilworth was insolvent at the end of petitioner's 1987 taxable year, and that the cause of Kenilworth's insolvency was the Crash, which was sudden and unexpected.  It was reasonable for the Board (on behalf of petitioner) to conclude that Kenilworth was unable to pay any of this $5 million in the future.  The Board arrived at its conclusion of worthlessness through the exercise of sound business judgment.  The Board considered all of the pertinent information that was reasonably obtainable at the time, including Kenilworth's potential for improving its financial position, and it consulted petitioner's advisers including petitioner's independent certified public account.

We hold for petitioner on this issue.

3.  Additions to Tax

Respondent also determined additions to tax for negligence under section 6653(a)(1)(A) and (B) (for 1987) and section 6653(a)(1) (for 1988), asserting that petitioner's underpayment of income taxes in each year was due to negligence or intentional disregard of rules or regulations. For the respective years, section 6653(a)(1)(A) and section 6653(a)(1) impose an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is due to negligence. For petitioner's 1987 taxable year, section 6653(a)(1)(B) imposes an addition to tax equal to 50 percent of the interest payable on the amount of the underpayment that is due to negligence. With respect to all of these additions to tax, negligence includes a lack of due care or a failure to do what a reasonable and ordinary prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner bears the burden of proving that respondent's determination of negligence is erroneous. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Following our review of the record, and in light of the persuasive testimony of Mr. Roven and Ms. Martin, we hold that petitioner is not liable for any of the additions to tax determined by respondent.[6] We believe that petitioner (through its management) acted as a reasonable and prudent person would

---

[6] This holding applies to the additions to tax as they relate to both the determinations at issue and the determinations that were conceded by petitioner.

have acted under the circumstances herein.  It is also relevant that petitioner's 1987 and 1988 tax returns were prepared by the C.P.A., who was knowledgeable about the business and operation of all of the entities herein.

_____

In reaching all of our holdings herein, we have considered each argument made by respondent for contrary holdings, and, to the extent not mentioned above, find them to be irrelevant or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.