T.C. Memo. 2017-174

UNITED STATES TAX COURT

WILLIAM J. RUTTER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15480-14.                    Filed September 7, 2017.

<u>Robert S. Horwitz</u> and <u>Edward M. Robbins, Jr.</u>, for petitioner.

<u>Adam B. Landy</u>, <u>Thomas R. Mackinson</u>, and <u>Kaelyn J. Romey</u>, for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  With respect to petitioner's Federal income tax for 2009,

the Internal Revenue Service (IRS or respondent) determined a deficiency of

[*2] $978,778 and an accuracy-related penalty of $195,756 under section 6662(a).[1]

The principal issue for decision is whether petitioner is entitled to a business bad debt deduction under section 166(a). We hold that he is not and that he is liable for the accuracy-related penalty that respondent has determined.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and the attached exhibits are incorporated by this reference. Petitioner resided in California when he filed his petition.

Petitioner is a world-renowned scientist in the field of biotechnology. He received a bachelor of science degree from Harvard College, a master of science degree from the University of Utah, and a Ph.D. in biochemistry from the University of Illinois. He completed postdoctoral work at several universities, including the University of Wisconsin and the Nobel Institute in Sweden.

In 1955 petitioner began his academic career as a professor of biochemistry at the University of Illinois. He moved to the University of Washington in 1965 and was subsequently recruited by the University of California, San Francisco (UCSF). He served there from 1969 to 1982 as the Herzstein professor and chair

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect for the relevant year, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[*3] of the biochemistry and biophysics department. He has published 400 scientific papers during his career and holds more than 25 patents. He has received numerous awards and accolades for his accomplishments in the biotechnology field. A building on a UCSF campus bears his name.

Shortly before leaving UCSF petitioner formed Chiron Corp. (Chiron), one of the first publicly held biotechnology companies. Under his leadership Chiron made major contributions in the areas of vaccines and infectious diseases. These included: (1) sequencing the HIV genome; (2) discovering the Hepatitis C virus; (3) developing a diagnostic test to detect HIV and the Hepatitis B and C viruses; (4) developing the first vaccine for the Hepatitis B virus using recombinant DNA technology; and (5) codeveloping a method to clone human insulin genes to produce vaccines that are used throughout the world today.

In 1995 Ciba-Geigy, a Swiss pharmaceutical company, acquired 49% of Chiron's outstanding stock. Ciba-Geigy had previously partnered with Chiron to produce vaccines using mass-production techniques. Ciba-Geigy subsequently merged with another company to form Novartis. Novartis purchased from petitioner the remaining 51% of Chiron's stock in 2006.

Following Ciba-Geigy's initial investment in Chiron, petitioner made other startup investments in the biotechnology field. In 1999 he formed Synergenics, a

[*4] service company that performed back-office support for the startup companies in which he invested. During 2009 Synergenics was a disregarded entity whose income and expenses petitioner reported on a Schedule C, Profit or Loss From Business.

## A.    The Business

Although petitioner created numerous startup companies, the focus of our interest is iMetrikus (originally called Healthvantage, Inc.), which petitioner acquired in 1999. In June 2002 he incorporated iMetrikus International (IM), and iMetrikus became its wholly owned subsidiary. For convenience, we will refer to these companies collectively as IM.

IM was a "telehealth" company that developed technology systems to enable remote monitoring of patients' health. The products it developed included MediCompass and Metrilink. MediCompass was an application designed to access clinical data to help doctors improve patient compliance and optimize treatment plans. MetriLink was a device designed to upload data from end-user monitoring tools to a "personal health record" to help patients have better control over their health regimens.

IM had an unusual capital structure. Although petitioner was its driving force, he owned no common stock. IM had about 70 common shareholders, in-

[*5] cluding key employees and some of petitioner's family members. But common stock formed a minuscule portion of its capital structure. From the time petitioner incorporated IM through December 2009, IM's primary funding source took the form of cash advances from petitioner.[2]

Between September 2000 and February 2002 petitioner made 39 separate cash advances to IM totaling approximately $10.6 million. For each advance IM executed a substantially identical convertible promissory note. Each note provided that IM had the right to convert the note into common or preferred stock depending on certain events. Each of the 39 notes bore 7% interest. IM duly paid all interest on these notes when due.

Between February 2002 and May 2005 petitioner advanced to IM another $22 million. Only $3.4 million of these advances was covered by promissory notes. For the remaining $18.6 million petitioner received no promissory note or other evidence of indebtedness. IM recorded all these advances as loans on its books, and these advances continued to accrue interest at 7%, the rate appearing on the last promissory note that petitioner and IM had executed. But after February 2002 IM paid no interest on any of this purported indebtedness.

---

[2]Petitioner made many of these advances through a revocable trust. For convenience, we will refer to all advances as having been made by petitioner.

**[*6]** By May 2005 petitioner had advanced approximately $43.4 million to IM. That same month IM converted the entirety of this purported indebtedness to preferred stock as part of a "Series D Preferred Stock Financing." The May 2005 conversion gave petitioner preferred stock with a face value of $43.4 million. After this conversion roughly 78% of IM's capital structure consisted of preferred stock owned by petitioner.

Between May 2005 and December 2009 petitioner made additional cash advances to IM totaling $43.04 million. These advances were IM's sole source of funding during this period. Petitioner generally made these advances monthly or semimonthly in amounts sufficient to cover IM's budgeted operating expenses for the ensuing period.

IM executed no promissory notes for these advances and furnished no collateral. As before, it recorded these advances on its books as loans and accrued interest at the 7% rate reflected on the promissory notes executed in 2002. But it never paid a penny of interest on any of this purported indebtedness. As of December 31, 2009, the balance of petitioner's open-account advances to IM, including accrued interest, was approximately $47.5 million. That sum, coupled with his $43.4 million of preferred stock, constituted roughly 92% of IM's capital structure as of that date.

**[\*7]** IM's business plan was to create pilot programs for telehealth products and services by seeking partnerships with pharmaceutical companies, healthcare providers, and technology companies. Its partners before 2009 included Yahoo, WebMD, and Aetna. Although none of these ventures yielded profits, IM appeared to have better somewhat prospects in 2009. Early that year petitioner and IM officers held separate discussions with executives from General Electric (GE) and Google concerning a possible equity investment in IM. The discussions with GE fizzled out early because GE acquired another business to develop this field.

IM's discussions with Google appeared more promising. Between July and October 2009 petitioner and Google personnel exchanged emails concerning a possible strategic partnership. Google was interested in integrating IM's devices into Google applications on cell phones, tablets, and personal computers.

Petitioner prepared a Powerpoint presentation highlighting the hoped-for benefits of pairing IM's advanced technology with Google's market share in the technology field. At the end of October, Cathy Gordon, a director of business development at Google, offered to connect petitioner with Google executives for further discussion of a partnership arrangement. In early December 2009 petitioner prepared another Powerpoint presentation emphasizing the large market

[*8] available for IM's devices (including patients with significant medical needs and thousands of medical professionals, insurance companies, and pharmacies).

The ensuing email correspondence suggests that Google was genuinely interested in integrating IM's products into its applications.  In December 2009 petitioner emailed IM's employees to inform them that "convergent forces" had "created great potential for change" and had "created an unusual opportunity for consumer oriented approaches."  This upbeat assessment contrasted with his dour assessment at year-end 2008 when he informed IM's employees that the company was going through "a period of extreme financial and economic stress."

Discussions between IM and Google continued through January and February 2010.  But in March 2010 the dialogue turned south.  In an internal email dated March 22, 2010, Google executives stated that they "don't see * * * [a partnership with IM] being a cash infusion" because of concerns over IM's marketplace position and lack of success.  After further internal discussions Google finally decided in June 2010 not to enter into a partnership with IM.

IM incurred substantial losses in most years of its existence.  Its aggregate losses from 1999 through 2008 exceeded $75 million.  For 2007 it had revenue of $1,480,138 and operating expenses of  $10,612,411; for 2008 it had revenue of $383,090 and operating expenses of $9,750,156; and for 2009 it had revenue of

**[*9]** $482,036 and operating expenses of $8,174,559. It incurred additional net operating losses (NOLs) of about $8 million during 2010 and carried over approximately $83 million in NOLs to 2011. All of this stood in stark contrast to IM's projections at year-end 2007 that its revenues would increase to $15 million in 2008, to $50 million in 2009, and to $197 million by 2012.

B.    The Writedown

Because of IM's inability to form successful partnerships, petitioner began questioning the collectibility of his advances. Sometime in late 2009 he asked Laurence Bardoff, Synergenics' senior vice president, to evaluate IM's financial condition. Mr. Bardoff informed petitioner that its condition was precarious: Its 2008 revenue was 98% below target, and it had massive NOLs. Without petitioner's continued cash infusions the company would have to fold.

Between September and December 2009 petitioner discussed with Mr. Bardoff and with his personal accountant the possibility of claiming a bad debt loss deduction for some or all of his advances. In a series of emails Mr. Bardoff took the position that all of petitioner's advances were debt and that the advances should be written off individually under a "first-in, first-out" approach. Mr. Bardoff initially used $10 million as a placeholder number for the debt writedown. At the end of December the writedown was lowered to $8.55 million.

[*10] While Mr. Bardoff was preparing documents to implement the $8.55 million writedown, petitioner's personal attorney prepared a promissory note to consolidate the $34.5 million of advances that petitioner did not plan to write off. While these documents were being prepared, petitioner made additional monthly advances totaling $600,000 to IM. In March 2010 petitioner and IM executed a debt restructuring agreement, a consolidated promissory note for $34.5 million, and a certificate of debt forgiveness of $8.55 million. All of these documents were backdated to December 31, 2009.

IM continued to operate at least through 2013. Petitioner revised its business model to focus on product lines in social networking. He advanced another $37.75 million to IM during 2010-2013, again evidenced by no promissory notes.

C.    The Examination

Petitioner timely filed his 2009 Federal income tax return. He included in this return a Schedule C for Synergenics that reported (among other things) an $8.55 million business bad debt loss reflecting the writedown of his advances to IM. According to petitioner, this loss corresponded to advances he had made during 2005 and 2006 after the conversion of his previous advances to preferred stock. No accrued interest was included in the $8.55 million writedown. Petitioner claimed this loss in full as a deduction against ordinary income.

**[\*11]** The IRS selected petitioner's 2009 return for examination. It disallowed the business bad debt deduction in full, made various computational adjustments, and determined an accuracy-related penalty. It issued petitioner a timely notice of deficiency, and he timely petitioned this Court.

D.   The Experts

At trial petitioner presented the report and testimony of Brian MacKenzie, a valuation expert and principal with KPMG. The Court recognized Mr. MacKenzie as an expert in business valuation. He has prepared more than 500 appraisals in his career.

Mr. MacKenzie performed an appraisal that estimated IM's fair market value (FMV) at year-end 2008 and 2009. For both years he used the market approach and the income approach. In determining IM's value at year-end 2008 he relied heavily on management's projections of future revenue, cashflows, and expenses as stated in a financial forecast dated December 31, 2007. Notwithstanding the worldwide financial crisis, he opined that market conditions had not materially changed during 2008. He used the weighted average of his outcomes under the two approaches to determine that IM's FMV at year-end 2008 was $55.4 million.

In determining IM's value at year-end 2009 Mr. MacKenzie used the same valuation approaches but adjusted his appraisal downward, chiefly because of

[*12] management's representations that increased competition had substantially diminished its prospects. Mr. MacKenzie relied heavily on management's representation that discussions with Google had effectively collapsed by year-end 2009. On the basis of this information he determined that the company's FMV during 2009 had declined by 74%, from $55.4 million to $14.3 million.

Respondent offered, and the Court recognized, James E. McCann as an expert in business valuation. Mr. McCann opined that Mr. MacKenzie's appraisal was flawed in several respects. With respect to the year-end 2008 valuation, he opined that Mr. MacKenzie gave undue weight to management's year-end 2007 financial forecast. He noted that the macroeconomic environment had deteriorated during the ensuing 12 months. And he noted that management's revenue projections were wildly inflated: IM's actual revenues for 2008 were $383,090, about 98% below the $15 million projected at year-end 2007.

Mr. McCann opined that IM's financial condition at year-end 2009 did not differ materially from its financial condition at year-end 2008. At both dates IM's cash balances were insufficient to cover its expenses for more than two months. It was thus entirely dependent at all times on cash infusions from petitioner to stay afloat. He accordingly discerned no factual basis for Mr. MacKenzie's hypothesis that IM's FMV had declined by 74% during calendar year 2009.

**[*13]**                                                    OPINION

The IRS' determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving them erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The taxpayer bears the burden of proving his entitlement to deductions allowed by the Code and of substantiating the amounts of expenses underlying claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs. Petitioner contends that respondent bears the burden of proof because he raised "new matter[s]" at trial and in his post-trial briefs. See Rule 142(a)(1). Because we decide all factual issues on a preponderance of the evidence, we need not decide who has the burden of proof. See sec. 7491(a); Estate of Turner v. Commissioner, 138 T.C. 306, 309 (2012), supplementing T.C. Memo. 2011-209.

I.      Bad Debt Loss

    A.      Governing Statutory Framework

Section 166(a)(1) allows as a deduction any bona fide debt that becomes worthless within the taxable year. For a nonbusiness bad debt held by a taxpayer other than a corporation, section 166(a)(1) does not apply, and the taxpayer is allowed a short-term capital loss for the taxable year in which the debt becomes completely worthless. Sec. 166(d)(1); sec. 1.166-5(a)(2), Income Tax Regs.

**[*14]**  Section 166(d)(2) defines a business debt as "a debt created or acquired

 * * * in connection with a trade or business of the taxpayer" or "a debt the loss

from the worthlessness of which is incurred in the taxpayer's trade or business."

To be eligible to deduct a loss as a business bad debt, an individual taxpayer must

show that he was engaged in a trade or business and that the debt was proximately

related to that trade or business.  Putoma Corp. v. Commissioner, 66 T.C. 652, 673

(1976), aff'd, 601 F.2d 734 (5th Cir. 1979); sec. 1.166-5(b), Income Tax Regs.

A bona fide debt is a debt that arises from "a debtor-creditor relationship

based upon a valid and enforceable obligation to pay a fixed or determinable sum

of money."  Kean v. Commissioner, 91 T.C. 575, 594 (1988); sec. 1.166-1(c),

Income Tax Regs.  A gift or contribution to capital is not considered a "debt" for

purposes of section 166.  Kean, 91 T.C. at 594.  Whether a purported loan is a

bona fide debt for tax purposes is determined from the facts and circumstances of

each case.  See A.R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir.

1970); Gross v. Commissioner, 401 F.2d 600, 603 (9th Cir. 1968), aff'g T.C.

Memo. 1967-31; Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).

Advances made by an investor to a closely held or controlled corporation

may properly be characterized, not as a bona fide loan, but as a capital contribu-

tion.  See Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968);

**[\*15]** <u>Shaw v. Commissioner</u>, T.C. Memo. 2013-170, 106 T.C.M. (CCH) 54, 56, <u>aff'd</u>, 623 F. App'x 467 (9th Cir. 2015). In general, advances made to an insolvent debtor are not debts for tax purposes but are characterized as capital contributions or gifts. See <u>Dixie Dairies Corp.</u>, 74 T.C. at 497; <u>Davis v. Commissioner</u>, 69 T.C. 814, 835-836 (1978). For an advance to constitute a bona fide loan, the purported creditor must expect that the amount will be repaid. See <u>CMA Consol., Inc. v. Commissioner</u>, T.C. Memo. 2005-16, 89 T.C.M. (CCH) 701, 724.

To give rise to a deduction under section 166(a)(1), a debt must have become wholly worthless during the tax year. Sec. 1.166-3(b), Income Tax Regs.; see <u>Bodzy v. Commissioner</u>, 321 F.2d 331, 335 (5th Cir. 1963), <u>aff'g in part, rev'g in part</u> T.C. Memo. 1962-40. In the case of a partially worthless debt, section 166(a)(2) provides that, "[w]hen satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction." "Before a taxpayer may deduct a debt in part, he must be able to demonstrate to the satisfaction of the district director the amount thereof which is worthless and the part thereof which has been charged off." Sec. 1.166-3(a)(2)(iii), Income Tax Regs.

**[\*16]** This case presents three major questions under the statutory and regulatory regime outlined above. These questions are: (1) whether petitioner's advances to IM constituted debt or equity; (2) if the advances constituted debt, and if the debt was held by "a taxpayer other than a corporation," whether the debt was a business or a "nonbusiness" debt under section 166(d); and (3) if the debt was a business debt, whether the writedown should be characterized as involving a "wholly worthless" or "partially worthless" debt and whether petitioner satisfied the relevant requirements for claiming a deduction. We address these questions in turn.

### B. Debt vs. Equity

Petitioner asserts that all of his advances to IM constituted bona fide debt whereas respondent contends that petitioner made capital investments in his capacity as an investor. In determining whether an advance of funds constitutes bona fide debt, "economic reality provides the touchstone." Shaw, 106 T.C.M. (CCH) at 56. If an outside lender would not have lent funds to the corporation on the same terms as did the insider, an inference arises that the advance is a not a bona fide loan. See Fin Hay Realty Co., 398 F.2d at 697. The Court may properly characterize a transfer of funds to a corporation as other than a debt even if "all the formal indicia of an obligation were meticulously made to appear." Ibid.; Davis, 69 T.C. at 835 ("The question of whether the advances * * * are debt or

[*17] equity depends on the economic substance of the transactions between them and not upon the form of the advances."); see Estate of Reynolds v. Commissioner, 55 T.C. 172, 201-202 (1970).

Whether an advance of funds is treated as debt or equity "must be considered in the context of the overall transaction." Hardman v. United States, 827 F.2d 1409, 1411 (9th Cir. 1987). Generally, the focus of the debt-vs.-equity inquiry is whether the taxpayer intended to create a debt with a reasonable expectation of repayment and (if so) whether that intent comports with creating a debtor-creditor relationship. Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973). The key to this determination is generally the taxpayer's actual intent. Bauer v. Commissioner, 748 F.2d 1365, 1367-1368 (9th Cir. 1984), rev'g T.C. Memo. 1983-120; A.R. Lantz Co., 424 F.2d at 1333.

Absent stipulation to the contrary, appeal of this case would lie to the U.S. Court of Appeals for the Ninth Circuit. That court has identified 11 nonexclusive factors to determine whether an advance of funds gives rise to bona fide debt as opposed to an equity investment. See Hardman, 827 F.2d at 1411-1412 (citing Bauer, 748 F.2d at 1368); Bell v. Commissioner, __ F. App'x __, 2017 WL 2963547 (9th Cir. July 12, 2017) (reaffirming 11-factor test), aff'g T.C. Memo. 2015-111. Those factors are: (1) the labels on the documents evidencing the al-

[*18] leged indebtedness; (2) the presence or absence of a maturity date; (3) the source of payment; (4) the right of the alleged lender to enforce payment; (5) whether the alleged lender participates in management of the alleged borrower; (6) whether the alleged lender's status is equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) the adequacy of the alleged borrower's capitalization; (9) if the advances are made by shareholders, whether the advances are made ratably to their shareholdings; (10) whether interest is paid out of "dividend money"; and (11) the alleged borrower's ability to obtain loans from outside lenders. Hardman, 827 F.2d at 1411-1412.

### 1. Labels on the Documents

In considering this factor we focus on the type of instrument evidencing the advance. Id. at 1412. If the corporation issues a debt instrument, such as a bond, a debenture, or a promissory note, that labeling supports the debt characterization. Estate of Mixon v. Commissioner, 464 F.2d 394, 403 (5th Cir. 1972).

IM issued promissory notes for the cash advances petitioner made before March 2002. But those notes were converted to preferred stock in May 2005 and are not involved here. The $43.04 million involved here was advanced between May 2005 and December 2009. IM did not issue petitioner a single promissory

[*19] note to cover any of those advances. Rather, petitioner advanced cash on open account, generally monthly or semimonthly.[3]

In connection with the writedown, IM issued petitioner in March 2010 a promissory note for $34.5 million to consolidate the portion of his advances that he chose not to write off. This document was backdated to December 31, 2009. We find this document to have no probative value in the debt-vs.-equity analysis. It did not cover the $8.55 million of advances for which petitioner claims a loss; it was not created during the 2009 taxable year; and it was a self-serving document created in connection with petitioner's year-end tax planning. The absence of a promissory note or other evidence of indebtedness for the $8.55 million of advances supports characterizing them as equity.

### 2. Fixed Maturity Date

A fixed maturity date is indicative of an obligation to repay, which supports characterizing an advance of funds as debt. Hardman, 827 F.2d at 1413; Estate of Mixon, 464 F.2d at 404. Conversely, the absence of a fixed maturity date indicates that repayment depends on the borrower's success, which in turn supports

---

[3]The labels appearing on documents may have less importance when the parties are related. See Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 286 (1990). We do not find this proviso applicable here. IM issued discrete promissory notes for each of petitioner's advances before March 2002. He provided no convincing explanation as to why it stopped doing so.

[*20] characterization as equity. Hardman, 827 F.2d at 1413; Anchor Nat'l Life Ins. Co. v. Commissioner, 93 T.C. 382, 405 (1989); see Monon R.R. v. Commissioner, 55 T.C. 345, 359 (1970) ("[A] definite maturity date on which the principal falls due for payment, without reservation or condition, * * * is a fundamental characteristic of a debt.").

Because IM issued no promissory notes for any of the advances at issue, there was of necessity no fixed maturity date. Petitioner testified that because he was the only person advancing money to IM, he considered fixing of maturity dates to be "futile, senseless, and counter to the interests of all involved." We do not see how this testimony helps petitioner's position; it suggests that he was essentially indifferent as to how the advances were characterized. We find that the absence of any fixed maturity dates supports characterizing the advances as equity.

### 3. Source of Payments

In considering this factor we examine the alleged borrower's source of funds to repay the advances. Hardman, 827 F.2d at 1413. Where repayments depend on future corporate success, an equity investment may be indicated. Estate of Mixon, 464 F.2d at 405; Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 287-288 (1990). And where prospects for repayment are questionable because of

[*21] persistent corporate losses, an equity investment may be strongly indicated. Calumet Indus., Inc., 95 T.C. at 288.

IM had aggregate losses of $82.7 million during 1999-2009, and its expenses vastly exceeded its revenue for all relevant years. As of December 31, 2009, it had made no payments of principal or interest on petitioner's $43.04 million of cash advances. For much of the period after May 2005, IM was kept afloat because petitioner continued to provide monthly or semimonthly cash infusions keyed to IM's expected cash needs for the ensuing period. Thus, the most likely source of repayment of petitioner's advances would be further cash infusions from petitioner himself. This does not support characterizing his advances as debt.

Petitioner testified that he hoped to secure ultimate repayment upon sale of IM to a third party or a third-party investment in IM. But this is the hope entertained by the most speculative types of equity investors, such as venture capitalists and private equity firms. Petitioner was a "classic capital investor hoping to make a profit, not * * * a creditor expecting to be repaid regardless of the company's success or failure." Calumet Indus., Inc., 95 T.C. at 287-288. The fact that a corporate buyout was petitioner's ultimate expected source of repayment strongly supports characterization of his advances as equity.

**[\*22]**     4.     <u>Right To Enforce Payment of Principal and Interest</u>

A definite obligation to repay, backed by the lender's rights to enforce payment, supports a debt characterization.  <u>Hardman</u>, 827 F.2d at 1413.  A lack of security for repayment may support equity characterization.  <u>See</u> <u>Kraft Foods Co. v. Commissioner</u>, 232 F.2d 118, 122 (2d Cir. 1956) (suggesting that an "unconditional obligation" to pay principal and interest is a "necessary feature[] of indebtedness"); <u>Litton Bus. Sys., Inc.</u>, 61 T.C. at 381; <u>Am. Underwriters, Inc. v. Commissioner</u>, T.C. Memo. 1996-548, 72 T.C.M. (CCH) 1511.

Although petitioner's advances were shown as loans on IM's books, there was no written evidence of indebtedness fixing IM's obligation to repay at any particular time.  None of petitioner's advances was secured by any collateral.  And even if petitioner under these circumstances were thought to have a "right to enforce repayment," that right was nugatory because his continued cash infusions were the only thing keeping IM afloat.  Had he enforced repayment, he would simply have had to make a larger capital infusion the following month.  This strongly supports characterization of his advances as equity.

5.     <u>Participation in Management</u>

In considering this factor we examine whether the taxpayer making the advances receives increased management rights in the business.  Increased manage-

[*23] ment rights, in the form of greater voting rights or a larger share of the company's equity, support equity characterization. Hardman, 827 F.2d at 1413.

Evaluation of this factor is tricky because IM had an unusual capital structure. Although petitioner had de facto control, he literally owned no common stock. But through his cash advances and preferred stock he held about 92% of IM's capital. Petitioner contends that none of his advances gave him increased voting rights or a larger equity share, and this is literally true. But it also means little because he already had complete control of the company by virtue of his status as its sole funder. To the extent this factor is relevant here it supports characterizing the advances as equity.[4]

### 6.        Status Relative to Regular Creditors

In considering this factor we examine whether the alleged lender's rights are equal or inferior to those of an ordinary corporate creditor. Ibid. If the purported creditor subordinates his right to repayment to that of other creditors, this supports

---

[4]Petitioner contends that he intentionally used cash advances instead of equity investments to fund IM because he "did not want to dilute the common shareholders." Our task in this case is to determine the true character of petitioner's advances for purposes of Federal tax law; how those advances would be treated under California corporate law is an entirely separate question that is not before us. If petitioner's advances were treated as preferred stock under State corporate law, they would not "dilute the common shareholders" any more than petitioner did in May 2005 when he converted his prior $43.4 million of advances to preferred stock.

[*24] an equity characterization. See CMA Consol., Inc., T.C. Memo. 2005-16. But see Kraft Foods Co., 232 F.2d at 125-126 ("Subordination to general creditors is not necessarily indicative of a stock interest.").

Petitioner was the only supplier of cash to IM. It borrowed no money from banks and thus had no "regular creditors." While it is thus impossible to draw a relative comparison between petitioner and other creditors, it is significant that petitioner had, in absolute terms, none of the rights that a "regular creditor" would have. There was no promissory note, no maturity date, no collateral, no protective covenant, no personal guaranty, and no payment of interest. No "regular creditor" would have lent funds to a loss-ridden company like IM on such terms. We find that this factor, to the extent relevant here, supports characterizing the advances as equity.

### 7. Parties' Intent

In considering this factor we examine whether the taxpayer and the corporation intended the advance to be debt or equity. Hardman, 827 F.2d at 1413. When analyzing intent we look at the taxpayer's actual intent when the advances were made. A.R. Lantz Co., 424 F.2d at 1333. Our aim is to determine whether the taxpayer intended to create a "definite obligation, repayable in any event." See Hewlett-Packard Co. v. Commissioner, T.C. Memo. 2012-135, 103 T.C.M. (CCH)

**[\*25]** 1736, 1752.  Intent is a factual issue that is decided on the basis of all the facts and circumstances in each case.  See generally United States v. Uneco, Inc. (In re Uneco, Inc.), 532 F.2d 1204, 1208 (8th Cir. 1976); Estate of Mixon, 464 F.2d at 402.

Petitioner's actions strongly suggest that he intended the advances to be equity.  He did not execute promissory notes for any of the advances at issue.  He received no interest on his advances and made no effort to collect interest or enforce repayment of principal.  Although IM recorded the advances as loans and accrued interest on them, petitioner's control over the company gave him ultimate discretion to decide whether and how repayment would be made.  In fact, he expected to be repaid, as a venture capitalist typically expects to be repaid, upon sale of IM to a third party or a third-party investment in IM.  This factor weighs in favor of treating the advances as equity.

### 8.    Inadequate Capitalization

In considering this factor we examine whether the purported borrower had "thin" capitalization.  A company's capitalization is relevant to determining the level of risk associated with repayment.  Bauer, 748 F.2d at 1369.  Advances to a business may properly be characterized as equity if its capitalization is sufficiently

[*26] poor as to make repayment unlikely.  Hardman, 827 F.2d at 1414; CMA

Consol., Inc., T.C. Memo. 2005-16.

Petitioner urges that he should be regarded as having written off, on a FIFO

basis, the $8.55 million of advances that he made between May 2005 and June

2006, immediately after converting his previous $43.4 million of advances to pre-

ferred stock.  At that point, he notes, the bulk of IM's capital structure consisted of

preferred stock.  He accordingly insists that IM was adequately capitalized at the

time he made those advances.

As we explain more fully, infra pp. 37-39, we do not think petitioner's

assessment of the situation is correct.  During 2005-2009 he made dozens of

fungible cash advances totaling $43.04 million.  In December 2009 he decided to

write off a portion of this sum, executing a certificate of debt forgiveness for $8.55

million and receiving a $34.5 million promissory note for the balance.  In deter-

mining whether petitioner's advances were debt or equity, we think it appropriate

to consider IM's capitalization throughout this period.

Between May 2005 and December 2009, petitioner's aggregate cash ad-

vances ($43.04 million) roughly equaled the face value of IM's preferred stock

($43.4 million).  While this suggests that IM's capitalization may have been

adequate, that fact would not seem compelling here.  Normally, a large "equity

[*27] cushion" is important to creditors because it affords them protection if the company encounters financial stress: The creditors will not be at risk unless the common and preferred shareholders are first wiped out. But because petitioner himself supplied almost 100% of IM's "equity cushion," he would not derive much comfort from the latter prospect. On balance, we conclude that this factor slightly favors petitioner or is neutral.

9.     Identity of Interest Between Creditor and Sole Shareholder

In considering this factor we examine whether the advance is made by a sole shareholder. Hardman, 827 F.2d at 1414. Petitioner was not IM's sole shareholder, but he controlled the company and during the relevant period owned between 78% and 92% of IM's capital structure. There was thus a considerable, albeit incomplete, identity of interest between petitioner in his capacities as owner and alleged lender. Under these circumstances, there was not a "disproportionate ratio between * * * [the] stockholder's ownership percentage and the corporation's debt to that stockholder." Am. Underwriters, Inc., 72 T.C.M. (CCH) at 1513. On balance, we find that this factor slightly favors respondent or is neutral.

10.     Payment of Interest

In considering this factor we examine the source of interest payments. Hardman, 827 F.2d at 1414. If no interest whatever is paid, that fact supports

[*28] equity characterization. Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 605 (1991); Am. Underwriters, Inc., 72 T.C.M. (CCH) at 1518. IM made no interest payments on any of the advances that petitioner made between February 2002 and December 2009. This fact strongly supports characterization of the advances as equity.

11.    Ability To Obtain Loans From Outside Lending Institutions

The final factor we examine is whether the purported debtor could have obtained similar funding from third-party lenders. Hardman, 827 F.2d at 1414. Evidence that the business could not have obtained loans from outside sources supports characterization of an insider's advances as equity. Ibid.; Calumet Indus., Inc., 95 T.C. at 287. We have recognized that lenders in related-party contexts may offer more flexible terms than could be obtained (say) from a bank. See C.M. Gooch Lumber Sales Co. v. Commissioner, 49 T.C. 649, 659 (1968), remanded on a different issue, 406 F.2d 290 (6th Cir. 1969). Our primary inquiry is whether the terms of the purported debt were a "patent distortion of what would normally have been available" to the debtor in an arm's-length transaction. See Litton Bus. Sys., Inc., 61 T.C. at 379; Nestle Holdings, Inc. v. Commissioner, T.C. Memo. 1995-441, aff'd in part, rev'd in part, 152 F.3d 83 (2d Cir. 1998); cf. Segel v. Commissioner, 89 T.C. 816, 832-834 (1987) (stating that the benchmark for

[*29] economic reality is whether a third-party lender would have made the advances in substantially the same form and on substantially the same terms).

The evidence is clear that no third party operating at arm's length would have lent $43 million to IM between May 2005 and December 2009 without insisting (at a minimum) on promissory notes, regular interest payments, collateral to secure the advances, and a personal guaranty from petitioner. Especially is that so where (as here) the purported debtor was losing about $8 million a year and could not fund its operations without petitioner's monthly cash infusions.

IM's financial condition has been extremely precarious in every year since its inception. Respondent's expert, Mr. McCann, determined that IM had an extremely high risk of bankruptcy and that, without petitioner's continued advances, it would surely have ceased operations within one or two months. Under these circumstances, no third-party lender would have lent $43 million to IM on the terms petitioner did.

In addition, petitioner continued to advance funds to IM even after he concluded that its financial condition was dire enough to justify writing off some of his advances. He advanced $600,000 to IM near the end of 2009 while his lawyers were preparing documents to write down his prior advances. And he advanced another $37.75 million to IM during 2010-2013, again evidenced by no

**[\*30]** promissory notes.  An unrelated lender would not have acted in this manner.
See Shaw, 106 T.C.M. (CCH) at 57 (concluding that shareholder's advances to
family corporation were equity where she "left the spigot open" after its financial
position became more precarious).  All in all, we conclude that this final factor
weighs in favor of equity characterization.[5]

Our debt-vs.-equity determination does not depend merely on counting fac-
tors but on evaluating the factors as a whole.  See Hardman, 827 F.2d at 1412.
Here, we find that 8 of the 11 factors favor characterizing petitioner's advances as
equity, and several point very strongly in that direction.  Two factors slightly favor
equity characterization or are neutral.  And just one factor favors debt characteri-
zation and does so only slightly.  Evaluating the factors overall we find that peti-
tioner's advances, including the advances corresponding to his $8.55 million
writedown, were equity investments and not debt.

---

[5]Petitioner introduced testimony from Mr. Bardoff that an "outside vendor"
advanced funds to IM in 2013 or 2014.  Petitioner supplied no evidence as to:  (1)
the identity of this vendor; (2) whether the vendor was a truly unrelated party; (3)
the amount of money it advanced; (4) whether it demanded a guaranty from peti-
tioner; or (5) the other terms on which it supposedly advanced the funds.  We ac-
cordingly found this testimony to lack credibility and probative value.  In any
event, the relevant question is whether an unrelated lender would have lent funds
to IM at the time petitioner did (i.e., between May 2005 and December 2009) on
the same terms as petitioner did.  Petitioner introduced no evidence to support an
affirmative answer to that question.

**[*31]** C.   Business vs. Nonbusiness Debt

Our finding that petitioner's advances constituted equity investments rather than debt is sufficient to support our holding that he is not entitled to a bad debt deduction.  For the sake of completeness, however, we will consider his ability to satisfy the other requirements for claiming a deduction against ordinary income under section 166(a).

"In the case of a taxpayer other than a corporation," section 166(a) does not apply where the debt is a "nonbusiness debt."  Sec. 166(d)(1).  Although petitioner claimed the bad debt loss deduction on a Schedule C for Synergenics, an LLC, he does not contend that Synergenics actually advanced any of the funds at issue.  All of the advances were made by petitioner or his revocable trust.  Thus, unless the advances constituted a "business debt," petitioner would not be entitled to a deduction under section 166(a).

Section 166(d)(2) defines a business debt as "a debt created or acquired * * * in connection with a trade or business of the taxpayer" or "a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." To be eligible to deduct a loss as a business bad debt, a taxpayer must show that he was engaged in a trade or business and that the debt was proximately related to his trade or business.  United States v. Generes, 405 U.S. 93, 96 (1972); Dagres v.

[*32] Commissioner, 136 T.C. 263, 282 (2011); Putoma Corp., 66 T.C. at 673; sec. 1.166-5(b), Income Tax Regs. To be engaged in a trade or business, the taxpayer must participate in the activity with continuity and regularity, and his primary purpose for engaging in the activity must be for income or profit. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). The management of one's investments, no matter how extensive, is not a "trade or business." Whipple v. Commissioner, 373 U.S. 193, 200 (1963).

Respondent contends that petitioner made his advances in his capacity as an investor. Petitioner contends that he made his advances in pursuit of his trade or business as a "lender" or as a "promoter" of startup companies. We find neither of petitioner's contentions persuasive.

Taxpayers who advance funds to controlled corporations often assert that they are in the lending business. But "[t]he right to deduct bad debts as business losses is applicable only to the exceptional situations in which the taxpayer's activities in making loans * * * [are] so extensive and continuous as to elevate that activity to the status of a separate business." Imel v. Commissioner, 61 T.C. 318, 323 (1973); Cooper v. Commissioner, T.C. Memo. 2015-191, 110 T.C.M. (CCH) 321, 321 (describing factors used to evaluate whether a taxpayer's lending activity rises to the level of a discrete trade or business).

[*33]  There is no support in the record for petitioner's assertion that he was in the business of lending money.  He advanced more than $80 million to IM without executing promissory notes or collecting interest.  No bank or other professional lender operates in this fashion.  Indeed, Mr. Bardoff acknowledged in an email that petitioner "is not a traditional banker looking at liquid assets asking for regular repayment on loans.  Rather he instead very actively seeks to increase the value of the assets they are trying to create."

Petitioner's advances to IM were indisputably "extensive and continuous."  But this shows only that IM was continuously in need of money, not that petitioner was in the lending business.  To establish that he was in the lending business petitioner must show that he lent money, as banks do, with the expectation of making a profit on his loans.

But petitioner did not collect a penny of interest on his advances during the eight-year period commencing March 2002.  He likewise sought no repayment of principal; indeed, he admitted that he hoped to be repaid, as a venture capitalist typically hopes to be repaid, upon ultimate sale of IM to a third party or a third-party investment in IM.  This is not how lenders expect to make a profit.  We find no evidentiary support for the proposition that petitioner's advances constituted "a

**[*34]** debt created or acquired * * * in connection with a trade or business" of lending money in which he was personally engaged. See sec. 166(d)(2)(A).

Petitioner likewise failed to establish that he was engaged in the "trade or business" of promoting biotech startup companies. See sec. 166(d)(2)(B). Contrary to his view, the Supreme Court's opinion in Whipple does not support his position. The taxpayer there formed a series of companies and advanced substantial funds to one of them, a soft drink bottling company. Whipple, 373 U.S. at 195-196. That company made no payments to him during the years at issue, and he eventually wrote off part of his advances as a business bad debt loss.

The Supreme Court sustained the disallowance of his claimed deduction, ruling that he was not in the "trade or business" of bottling or any other business that would enable him to deduct the advances as a business bad debt. Id. at 197. "Devoting one's time and energies to the affairs of a corporation," the Court ruled, "is not of itself, and without more, a trade or business of the person so engaged." Id. at 202. And "[e]ven if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities * * * [of] an investor concerned with, and participating in, the conduct of the corporate business." Ibid.

[*35] In subsequent cases we have held that a taxpayer is not in the business of being a "promoter" where he is entitled to no compensation other than a normal investor's return. See, e.g., Dagres, 136 T.C. at 281-282 (noting that a promoter "receives not just a return on his own investment but compensation attributable to his services"); Deely v. Commissioner, 73 T.C. 1081, 1095-1096 (1980) (stating that, "in order for a promoter to be engaged in a trade or business for tax purposes he must do so for 'compensation other than the normal investor's return'" (quoting Millsap v. Commissioner, 46 T.C. 751, 756 (1966), aff'd, 387 F.2d 420 (8th Cir. 1968))); Ackerman v. Commissioner, T.C. Memo. 2009-80, 97 T.C.M. (CCH) 1392, 1414 (finding no trade or business as "promoter" where taxpayer did not receive fees or commissions for providing advisory services). Here, petitioner received no fees, commissions, or other compensation for his services. He expected to receive the return that equity investors normally hope for, namely, long-term gain upon appreciation or sale of IM's assets.

A taxpayer may be able to show that he is engaged in business as a "promoter" or "trader" if he establishes that his goal is to earn profits by "flipping" assets, i.e., making quick and profitable sales of real estate, securities, or other property. See, e.g., Assaderaghi v. Commissioner, T.C. Memo. 2014-33. Central to these holdings is that the taxpayer aimed for profit from frequent short-term

**[\*36]** sales, not from patient long-term investment. "It is the early resale which makes the profits income received directly for services, for the longer an interest is held, the more profit becomes attributable to the successful operation of the corporate business." Deely, 73 T.C. at 1093-1094; see Millsap, 46 T.C. at 756-757.

These cases do not help petitioner. He did not incorporate IM to make a profit from a quick and profitable sale. Quite the contrary: He testified that he invested in IM as he had invested successfully in Chiron, recognizing that each venture would take considerable time to develop into a successful business. Petitioner fit the paradigm of a patient long-term investor, advancing funds to IM continuously from 1999 through 2013 in the hope that his investment would eventually pay off. These are not the actions of a "promoter" or "trader."

In sum, we find that petitioner was not in the "trade or business" of lending money or promoting companies. If his advances were considered debt, they were neither debt "created or acquired * * * in connection with" a trade or business conducted by him nor debt the loss from the worthlessness of which was incurred in any trade or business he conducted. Sec. 166(d)(2)(A) and (B). At best, the advances would give rise to a nonbusiness bad debt which, upon becoming worthless, would generate a short-term capital loss. See sec. 166(d)(1)(B).

**[*37]** D.     <u>Worthlessness During 2009</u>

Assuming arguendo that petitioner's advances were debts and constituted business debts, he would be entitled to a deduction for 2009 only if he established worthlessness during 2009.  Section 166(a)(1) allows a deduction for a business bad debt loss if the debt "becomes worthless within the taxable year."  In the case of a partially worthless debt, section 166(a)(2) provides that, "[w]hen satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction."

To analyze this issue we must first decide whether petitioner's advances constituted separate individual "debts" (several of which allegedly became wholly worthless) or a single aggregate "debt" (which allegedly became worthless in part).  Petitioner contends that each of his advances was a separate "loan" and that he decided to write off some of the oldest loans that he made during 2005-2006.

To support his position he cites <u>KTA-Tator, Inc. v. Commissioner</u>, 108 T.C. 100 (1997).  We there held that, for purposes of section 7872, a corporate taxpayer's advances to related parties were separate loans, each of which constituted an "extension of credit."  <u>Id.</u> at 103.  Relying heavily on the legislative history of section 7872 and proposed regulations interpreting it, we held that the taxpayer's advances were more akin to separate transfers of money giving rise to

[*38] repayment rights than to an open line of credit upon which the transferees could draw at any time. Ibid.

We find this case inapposite here. The only question we addressed in KTA-Tator was whether the advances were separate extensions of credit "for purposes of section 7872," which governs the treatment of loans with below-market interest rates. 108 T.C. at 103. And petitioner's advances, unlike those in KTA-Tator, were clearly akin to "an open line of credit." Id. at 102. They were not evidenced by prommissory notes but were open-account advances of cash.

Treating petitioner's advances as separate loans might be appropriate if they were evidenced by promissory notes that had different maturities, different interest rates, or different levels of creditor protection in terms of covenants or collateral. But as Mr. Bardoff admitted, petitioner regarded all of his advances as fungible; he believed it unnecessary to execute promissory notes because he was the only person funding IM. Indeed, Mr. Bardoff's plan to write off the advances on a FIFO basis, as one would record the disposition of inventory, underscores the fungibility of the advances. Petitioner did not contend that his 2005 and 2006 advances were especially risky, and he could not plausibly make that argument because he advanced all the money on exactly the same terms.

**[\*39]** The economic reality is that petitioner advanced $43.04 million to IM on an open account, as needed by IM, as if he were extending a line of credit. Like a bank line of credit, this is properly regarded as a single aggregate debt. Mr. Bardoff confirmed the aggregate nature of the advances by stating his belief that petitioner was making a "partial write down" of this alleged debt.

We accordingly must decide whether petitioner met the requirements for establishing for 2009 a partially worthless debt. Sec. 166(a)(2). The year in which a purported debt becomes worthless must be fixed by identifiable events that make it reasonable for the lender to abandon any hope of recovery. Crown v. Commissioner, 77 T.C. 582, 598 (1981). Whether a debt has become worthless is a facts-and-circumstances determination. Sec. 166(a)(2); sec. 1.166-2(a), Income Tax Regs.

A taxpayer can establish worthlessness by showing that a debt has neither current nor potential value. Dustin v. Commissioner, 53 T.C. 491, 501 (1969), aff'd, 467 F.2d 47 (9th Cir. 1972). There is no standard test or formula for determining worthlessness; relevant facts include the debtor's solvency and the lender's collection efforts. See Aston v. Commissioner, 109 T.C. 400, 415 (1997); sec. 1.166-2(a), Income Tax Regs. Other relevant factors may include decline in the value of collateral, the debtor's earning capacity, events of default, the debtor's

[*40] refusal to pay, the debtor's lack of assets, actions the lender took to pursue collection, and subsequent dealings between the parties.  Am. Offshore, Inc., 97 T.C. at 594.  No single factor is conclusive.  Ibid.

The taxpayer's burden is especially great where he seeks to deduct a partially worthless debt.  The statute affords the IRS discretion on this point, providing that "the Secretary may allow such debt * * * as a deduction" if he is "satisfied that a debt is recoverable only in part."  Sec. 166(a)(2) (emphasis added).  "Before a taxpayer may deduct a debt in part, he must be able to demonstrate to the satisfaction of the district director the amount thereof which is worthless and the part thereof which has been charged off."  Sec. 1.166-3(a)(2)(iii), Income Tax Regs.[6]

The Commissioner's disallowance of a deduction under section 166(a)(2) will be sustained so long as he exercises his discretion reasonably.  Brimberry v. Commissioner, 588 F.2d 975, 977 (5th Cir. 1979), aff'g T.C.  Memo. 1976-209; Portland Mfg. Co. v. Commissioner, 56 T.C. 58, 72 (1971), aff'd on other grounds, 35 A.F.T.R. 2d (RIA) 75-1439, 75-1 U.S. Tax Cas. (CCH) para. 9449

---

[6]Banks receive more liberal treatment.  A partially charged-off loan is deductible by a bank if the charge-off is (among other things) "[i]n accordance with established policies" of the bank's regulator.  Sec. 1.166-2(d)(1), Income Tax Regs.

**[*41]** (9th Cir. 1975). His exercise of discretion will not be set aside unless it is arbitrary and unreasonable. Ark. Best Corp. & Subs. v. Commissioner, 800 F.2d 215, 221 (8th Cir. 1986), aff'g in part, rev'g in part 83 T.C. 640 (1984), aff'd on other grounds, 485 U.S. 212 (1988).

Petitioner has not made the showing that the statute and the regulations require. First, he has not established to the Commissioner's satisfaction, or ours, the amount of the debt that was worthless at year-end 2009. Sec. 1.166-3(a)(2)(iii), Income Tax Regs. The $8.55 million number he chose for the writedown (reduced from the $10 million "placeholder" figure Mr. Bardoff had used initially) appears to have been selected because it approximated the income petitioner realized earlier in 2009 from another of his startup companies. He made no effort to tie this writedown to IM's actual financial condition or ability to repay.

Second, petitioner did not show that any portion of his advances became worthless during 2009. He appears to have had a reasonable hope of recovering on his investments; that is presumably why he continued to advance another $37.75 million to IM during 2010-2013. See Crown, 77 T.C. 582, 598 (1981); Flood v. Commissioner, T.C. Memo. 2001-39, 81 T.C.M. (CCH) 1175, 1180 ("A debt becomes worthless in the tax year in which a creditor, using sound business judgment, abandons all reasonable hope of recovery[.]"); sec. 1.166-2(a), Income

[*42] Tax Regs. Conversely, if any portion of the debt was worthless, petitioner did not show that it became worthless in 2009 rather than in some earlier year. See Hirsch v. Commissioner, 124 F.2d 24, 31 (9th Cir. 1941) ("A taxpayer should not be permitted to close his eyes to the obvious, and to carry accounts on his books as good when in fact they are worthless, and then deduct them in a year subsequent to the one in which he must be presumed to have ascertained their worthlessness." (citing Avery v. Commissioner, 22 F.2d 6, 7-8 (5th Cir. 1927))), aff'g 42 B.T.A. 566 (1940).

In seeking an "identifiable event" that would cause partial worthlessness during 2009 in particular, petitioner and his expert seize upon the supposed collapse of IM's discussions with Google. But those discussions were proceeding apace through the end of 2009, complete with two Powerpoint presentations by petitioner to Google executives. The email correspondence convinces us that Google during 2009 was genuinely interested in the possibility of integrating IM's products into its applications.

It was not until March 2010 that Google reached an internal "no go" decision about partnering with IM, and that decision was not communicated to IM until June 2010. Petitioner's assertion that talks with Google had totally collapsed by year-end 2009 is hard to reconcile with these facts or with his upbeat assess-

[*43] ment, in a December 2009 email to IM employees, that "convergent forces" had "created great potential for change" and had "create[d] an unusual opportunity for consumer oriented approaches."

Petitioner relies heavily on Mr. MacKenzie's expert report to support his position that IM's value had declined from $55 million at year-end 2008 to $14 million at year-end 2009. We agree with Mr. McCann, respondent's expert, that Mr. MacKenzie's report is flawed in several respects. For 2008 Mr. MacKenzie relied heavily on management's revenue projections for that year, which were made in 2007. This reliance was clearly misplaced. The worldwide financial crisis that began during 2007 peaked in 2008, leading to a massive lack of liquidity in the financial system and leaving even stable companies starved for credit. The revenue projection that IM made in 2007 could not reasonably be taken at face value; in fact, IM's 2008 revenues were 98% below that target.

For 2009 Mr. MacKenzie relied heavily on the purported collapse of IM's partnership discussions with Google as his basis for determining that IM's value had declined by 74% from year-end 2008. As noted earlier, we find no factual support for this hypothesis; IM's discussions with Google were ongoing at year-end 2009 and did not turn south until mid-2010. Far from the 74% decline in value posited by Mr. MacKenzie, we find Mr. McCann's assessment more plau-

[*44] sible. Using conventional financial metrics, he concluded that IM's financial condition at year-end 2009 was not materially different from its financial condition at year-end 2008.

In sum, the IRS did not abuse its discretion in determining that petitioner was not entitled to a deduction of $8.55 million for a partially worthless debt for 2009. Even if petitioner established that his advances were debt and that this debt was a business debt, he did not meet the requirements for deducting a partially worthless debt under section 166(a)(2) and section 1.166-3(a)(2)(iii), Income Tax Regs.[7]

## II. Accuracy-Related Penalty

The Code imposes a 20% penalty upon the portion of any underpayment of income tax that is attributable (among other things) to "negligence" or any "substantial understatement of income tax." Sec. 6662(a) and (b)(1) and (2). "Negligence" is defined as "any failure to make a reasonable attempt to comply" with the provisions of the Code. Sec. 6662(c). An understatement of income tax is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1)(A).

---

[7]Given our disposition, we need not address respondent's contention that petitioner's deduction should be disallowed because the documents implementing the writedown were executed in February or March 2010 and backdated to 2009.

**[\*45]** Under section 7491(c) the Commissioner bears the burden of production with respect to the liability of an individual for any penalty. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Respondent met his burden as to a substantial understatement of income tax by showing that petitioner was not entitled to the $8.55 million bad debt deduction claimed on his 2009 return. The understatement of income tax attributable to that improper deduction exceeds 10% of the tax required to be shown on the return. The burden thus shifts to petitioner to prove that the penalty does not apply. See id. at 447.

A taxpayer may avoid the accuracy-related penalty by showing that he acted with reasonable cause and in good faith. Sec. 6664(c)(1). Reasonable cause requires that the taxpayer exercised ordinary business care and prudence as to the disputed item. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Good faith means, among other things, an honest belief and an intent to perform all lawful obligations. E.g., United States v. Hirschfeld, 964 F.2d 318, 322 (4th Cir. 1992).

Both of these determinations are made on a case-by-case basis, taking into account all relevant facts. Sec. 1.6664-4(b)(1), Income Tax Regs. Circumstances that may indicate reasonable cause and good faith include (among other things) an honest misunderstanding of fact or law that is reasonable in light of all the circum-

**[\*46]** stances, including the taxpayer's experience, knowledge, and education. The most important factor is the taxpayer's efforts to assess his tax liability correctly. Ibid.

A taxpayer may demonstrate reasonable cause and good faith by showing reliance on the advice of a tax professional, such as an accountant or a lawyer, regarding a particular item's tax treatment. Id. para. (c)(1). To rely in good faith on the advice of a professional, the taxpayer must show that: (1) the adviser "was a competent professional who had sufficient expertise to justify reliance"; (2) "the taxpayer provided necessary and accurate information to the adviser"; and (3) "the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A., 115 T.C. at 99.

Before turning to the Neonatology test, we first consider whether petitioner had "substantial authority" for his return position. See sec. 6662(d)(2)(B)(i). He contends that his characterization of the advances as debt is supported by the test enunciated by the Ninth Circuit in Hardman. See sec. 1.6662-4(d)(2) and (3), Income Tax Regs. We do not agree. Only one of the 11 Hardman factors supports debt characterization, and it does so only slightly; most of the other factors strongly support equity treatment. The other cases on which petitioner relies are inap-

**[\*47]** posite to the facts of this case or are irrelevant. The weight of authority supporting equity treatment for petitioner's advances is overwhelming.

We now consider whether petitioner has established a "reliance on professional advice" defense to the accuracy-related penalty under the <u>Neonatology</u> test. Petitioner must first show that he relied on "a competent professional who had sufficient expertise to justify reliance." <u>See</u> <u>Neonatology Assocs., P.A.</u>, 115 T.C. at 99. Petitioner contends that he relied on advice from Mr. Bardoff, a Synergenics vice president, and Jason Graham, his personal accountant. We find that Mr. Graham, a certified public accountant, is a competent tax professional.[8]

The second prong of the <u>Neonatology</u> test requires the taxpayer to show that he provided "necessary and accurate information" to the professional. <u>Ibid.</u>; <u>see</u> <u>Ma-Tran Corp. v. Commissioner</u>, 70 T.C. 158, 173 (1978). Mr. Bardoff reviewed IM's financial condition and researched the deductibility of bad debt losses. He then drafted memoranda and emails for Mr. Graham's review. On the basis of the information Mr. Bardoff provided to him, Mr. Graham agreed that a portion of the advances could be written off.

---

[8]Respondent contends that petitioner could not reasonably rely on Mr. Halasz (his personal attorney), on Matthew Sanders (IM's CEO), or on IM's tax return preparers. Because petitioner does not contend that he relied on any of these people, we need not address the application of the <u>Neonatology</u> test to them.

[*48] We find that Mr. Bardoff omitted or misstated several important facts in his communications with Mr. Graham. Mr. Bardoff erroneously told Mr. Graham that promissory notes existed for the advances and that IM had paid interest on them. (These facts are critical for at least three of the Hardman factors). Petitioner knew that there were no promissory notes and knew that he never received any interest payments, but at no point did he correct Mr. Bardoff's misstatements. We find that petitioner did not supply "necessary and accurate information" to Mr. Graham, the tax professional on whom he allegedly relied. See Neonatology Assocs., P.A., 115 T.C. at 99. We accordingly conclude that petitioner cannot avail himself of the "reliance on professional advice" defense to the accuracy-related penalty.[9]

To reflect the foregoing,

Decision will be entered for respondent.

---

[9]Because we find that petitioner did not supply accurate information to his tax adviser, we need not determine whether he "actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A., 115 T.C. at 99.